

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-29-1995

# Fashauer v NJ Trans Rail

Precedential or Non-Precedential:

Docket 94-5523

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Fashauer v NJ Trans Rail" (1995). *1995 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 94-5523


THOMAS FASHAUER, JR.

Appellant

v.

NEW JERSEY TRANSIT RAIL OPERATIONS, INC.


On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 92-cv-3459)


Argued May 23, 1995

BEFORE:  GREENBERG, ROTH and ALDISERT, Circuit Judges

(Filed: June 29, 1995)

Marvin I. Barish  (argued)
Marvin I. Barish Law Offices
Sixth & Walnut Streets
The Curtis Center, Suite 801
Philadelphia, PA  19106

Attorneys for Appellant

Cheryl A. Maccaroni (argued)
Deputy Attorney General
Joanne Stipick (argued)
Deputy Attorney General
Office of Attorney General of
New Jersey
Richard J. Hughes Justice Complex
Trenton, NJ  08625

Attorneys for Appellee

**OPINION OF THE COURT**

GREENBERG, <u>Circuit</u> <u>Judge</u>.

## I.  Introduction, Factual Background and Procedural History

This appeal arises in a Federal Employers' Liability Act (FELA) case in which the employer is New Jersey Transit Rail Operations, Inc.  To understand the germane facts one must in the first instance know a bit about New Jersey Transit train design.  On New Jersey Transit trains, or at least on the one involved here, cars are connected to each other by vestibules, which are enclosed areas located just outside the passenger seating compartments of each car.  Thus, each car contains two vestibules, one at each end.  Each vestibule, in turn, contains three doors -- one leading into the passenger compartment, the other two leading out of the train onto the station platform.[1]  Railroad employees and passengers walk through the vestibules to pass from one car to the next, and to exit from the car to the platform and vice versa.  While anyone may open the doors leading into the passenger compartments, railroad employees open and close the doors to the station platform by operating mechanisms located within the vestibule.

On March 10, 1992, appellant Thomas Fashauer was performing his usual duties as brakeman on a New Jersey Transit

---

[1].  Of course, depending on which side of the platform the train arrives, one of the two side doors opens.

train en route from Lindenwold, New Jersey, to Atlantic City, New Jersey. These duties included entering the vestibule, opening and closing the doors leading from the train to the station platform, and signaling the engineer that the platform was clear and that the train could depart. He began work in Atlantic City at 1:00 p.m. and made several round trips.

It was raining heavily, and the rug on the vestibule floor was soaked when the train arrived at the Atco station on the last run of the day. Fashauer opened the doors, exited the train, and, after checking the stairs for passengers running late, returned to the train and signaled the engineer to leave. Fashauer then shut the doors. The train jerked twice, once upon leaving the station and once soon after. Fashauer was not holding on to the handrails at the time, and he slipped on the wet floor, striking his left shoulder against the wall. He testified that he was in agony at the time, and he immediately reported the incident to the conductor. At the conductor's behest, Fashauer rested for the remainder of the trip. He suffered serious injuries to his shoulder as a result of the accident.

On August 21, 1992, Fashauer filed a complaint against New Jersey Transit in the United States District Court for the District of New Jersey, alleging that his injury was proximately caused by New Jersey Transit's negligence. Specifically, the complaint charged New Jersey Transit with negligently maintaining

certain seals between the cars, and further alleged that the defective seals allowed rain to seep into the vestibule, creating a dangerous slippery condition on a rainy day. He sought relief pursuant to the FELA, which governs actions by railroad employees against railroads for damages arising out of job-related injuries.

The case was tried between March 7, 1994, and March 16, 1994. New Jersey Transit defended against Fashauer's claims by presenting evidence that the seals were not defective, the slippery condition was purely the result of the rainy weather, and Fashauer failed to act with due care while walking through the vestibule. On March 16, the jury returned a verdict finding that New Jersey Transit was negligent and that its negligence contributed to the injuries. It awarded Fashauer damages of $71,320 in past lost earnings and $100,000 for pain and suffering. However, the jury awarded nothing for future lost earnings. Finally, the jury determined that Fashauer was 50% responsible for his injuries. Under FELA's pure comparative negligence provisions, this finding meant that the district court reduced Fashauer's damages by 50%. Unhappy with the 50% reduction and the jury's refusal to award damages for lost future earnings, Fashauer moved for a new trial. When that motion was denied on July 18, 1994 (in an Opinion and Order filed the next day), he timely filed this appeal.

The district court had jurisdiction pursuant to 28 U.S.C. § 1331.  We have jurisdiction pursuant to 28 U.S.C. § 1291.  We will affirm.

## II.  Discussion

Most of the questions on this appeal involve the district court's denial of Fashauer's jury charge requests.  Generally, "[t]he standard of review for the district court's ruling on points for charge is . . . abuse of discretion."  Link v. Mercedes-Benz of North America, Inc., 788 F.2d 918, 922 (3d Cir. 1986).  Where, as here, a party contends that the charge as given states an incorrect legal standard, "we will review the charge as a whole in the light of the evidence to determine if it fairly and adequately submitted the issues to the jury and we will reverse if the instructions were capable of confusing and thereby misleading the jury."  Griffiths v. CIGNA Corp., 988 F.2d 457, 462 (3d Cir.) (citing Limbach Co. v. Sheet Metal Workers Int'l Ass'n, 949 F.2d 1241, 1259 n.15 (3d Cir. 1991) (in banc)), cert. denied, ____ U.S. ____, 114 S.Ct. 186 (1993).  We address Fashauer's arguments in turn.

### A.  Assumption of Risk v. Contributory Negligence

The most significant question raised on this appeal is whether the district court erred by denying Fashauer's request to charge the jury that assumption of the risk is not a defense in a

FELA action.  Fashauer timely requested such a charge,[2] and

objected to the district court's charge, which declined to give

_____

[2].  At oral argument before us, a question was raised about
whether Fashauer adequately raised the issue before the district
court.  Fashauer proposed the following points for charge:

> The railroad cannot avoid liability for
> personal injury on the grounds that the
> injured party assumed the risk of his
> employment.  Assumption of risk is not a
> defense in a suit by a railroad worker
> against a railroad, and the railroad worker
> does not assume the risk of being injured
> through the negligence of his employer or the
> negligence of a fellow employee.
>
> You may not find contributory negligence on
> the part of the plaintiff simply because he
> acceded to the request or direction of a
> supervisor that he work at a dangerous job,
> in a dangerous place, or under unsafe
> conditions.
>
> The defendant has the burden of proving by a
> preponderance of the evidence, contributory
> negligence.  The plaintiff does not assume
> the risk of an unsafe place to work and
> cannot be blamed for working in an unsafe
> place.
>
> It is the duty of a railroad worker to do the
> work assigned.  It is not his duty to find
> the safest method of doing it, or to devise a
> safe[r] method.  Therefore, in considering
> the defendant's claim that the plaintiff was
> guilty of contributory negligence, the jury
> will bear in mind that the plaintiff is not
> chargeable with any negl[igent] conduct of
> his employer.  The plaintiff is only
> chargeable with his own conduct.  So in
> connection with the defendant's claim of
> contributory negligence, you will consider
> only what the plaintiff himself did, or
> failed to do, at the time and place in
> question as shown by a preponderance of the

it. Fashauer essentially contends that the district court's instructions inadvertently permitted the jury to reduce his recovery based on the fact that he continued to perform his job despite his knowledge that he was encountering a dangerous condition. He further contends that under the FELA the jury should not have been allowed to reduce his recovery because he assumed the risk of injury.

## 1. Introduction

Congress passed the Federal Employers' Liability Act of 1906 in part to eliminate barriers common law courts erected to protect railroad companies and other common carriers from liability for their employees' workplace injuries. See Tiller v. Atlantic Coast Line R. Co., 318 U.S. 54, 58-59, 63 S.Ct. 444, 447 (1943). The FELA "substituted comparative negligence for the strict rule of contributory negligence," id. at 62, 63 S.Ct. at

(..continued)
> evidence in the case. Thus, plaintiff cannot
> be found contributorily negligent based
> solely on his knowledge or acceptance of a
> dangerous situation or based on the fact that
> he was working at a dangerous job. Rather,
> you may find the plaintiff contributor[ily]
> negligent only if the defendant has proved by
> a preponderance of the evidence that
> plaintiff did not exercise slight care for
> his own protection.

Quoted in Fashauer's brief at 11-12 n.1. Although Fashauer's proposed instructions do not actually define assumption of the risk, we believe they adequately conveyed his view that the jury should not have been permitted to reduce his recovery based on actions that constitute assumption of the risk.

448-49, but, as interpreted by the Supreme Court, originally allowed an employer to interpose assumption of the risk as a complete defense to the employer's liability. See Seaboard Air Line Ry. v. Horton, 233 U.S. 492, 503, 34 S.Ct. 635, 639 (1915). The only statutory exception to this occurred "in . . . case[s] where the violation by [a] common carrier of [a] statute enacted for the safety of employees contributed to the injury of such employee." Id. at 502-03, 34 S.Ct. at 639. Following widespread criticism of its retention of the assumption of risk defense, Congress amended the FELA in 1939 to eliminate the defense in cases where the injury "resulted in whole or in part from the negligence of any of the officers, agents, or employees" of the employer. 45 U.S.C. § 54. Interpreting the amendments soon thereafter, the Supreme Court held that "every vestige of the doctrine of assumption of risk was obliterated from the law by the 1939 amendment," see Tiller, 318 U.S. at 57, 63 S.Ct. at 446, and that "cases tried under the Federal Act [are] to be handled as though no doctrine of assumption of risk had ever existed." Id. at 64, 63 S.Ct. at 450. The Court warned that "'[u]nless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name.'" Id. at 58, 63 S.Ct. at 447 (citation omitted).

### 2. Assuring Assumption of Risk Stays Out

In light of the 1939 amendment and Tiller's interpretation of it, because contributory negligence on the

plaintiff's part reduces his or her damages, while assumption of risk does not, courts have the delicate job of separating out evidence on one theory from evidence on the other. See Victor E. Schwartz, Comparative Negligence, § 9-4(a)(1) at 202 (3d ed. 1994) ("[F]acts constituting implied assumption of risk have no materiality except as they might also constitute contributory negligence."). Some courts have guarded against jury confusion by doing what Fashauer suggests the court should have done here: describing assumption of risk to the jury and instructing it not to reduce the plaintiff's recovery on that basis. See Koshorek v. Pennsylvania R.R. Co., 318 F.2d 364, 370 (3d Cir. 1963) (reversible error for district court not to instruct on assumption of risk); Jenkins v. Union Pacific R.R. Co., 22 F.3d 206, 212 (9th Cir. 1994) (same). But other courts have expressed wariness about instructing the jury on a legal doctrine not in the case. As one court has put it, "the statutory elimination of the defense of assumption of risk, when read to the jury in FELA cases where that 'defense' has been neither pleaded nor argued, serves only to obscure the issues in the case." Casko v. Elgin, Joliet and Eastern Ry. Co., 361 F.2d 748, 751 (7th Cir. 1966). The Court of Appeals for the Second Circuit, relying on the proposition that "'it is a mistake to give instructions on subjects not directly in issue in a case,'" DeChico v. Metro-North Commuter R.R., 758 F.2d 856, 861 (2d Cir. 1985) (citation omitted), has cautioned that "[a]n assumption of risk instruction

may be particularly inappropriate in cases where it 'might well cause such confusion as to water down or even eliminate the issue of contributory negligence.'" Id. at 861 (quoting Clark v. Pennsylvania R.R. Co., 328 F.2d 591, 595 (2d Cir.), cert. denied, 377 U.S. 1006, 84 S.Ct. 1943 (1964)); see also Clark v. Burlington N., Inc., 726 F.2d 448, 452 (8th Cir. 1984) ("Cases discussing the issue have generally condemned the giving of an assumption of risk instruction in FELA actions."); Heater v. Chesapeake and Ohio Ry. Co., 497 F.2d 1243, 1249 (7th Cir.) (an assumption of the risk "instruction is a confusing negative statement which refers to issues not involved in a FELA case"), cert. denied, 419 U.S. 1013, 95 S.Ct. 333 (1974).

These latter cases enunciate a salutary principle: Whenever possible, courts should spare juries intricate descriptions of opaque legal doctrines inapplicable to the case. And indeed, our caselaw, while limited, supports that principle. For example, in Seaboldt v Pennsylvania R.R. Co., 290 F.2d 296 (3d Cir. 1961), the district court at the last minute acceded to the plaintiff's request and charged the jury that assumption of risk is not a defense. Id. at 300. We pointed out that "for this difficult concept to be thrown into the jury's mind at the last minute without explanation was almost sure to have left it in confusion." Id. See also De Pascale v. Pennsylvania R.R. Co., 180 F.2d 825, 827 (3d Cir. 1950) (district court properly refused to instruct on assumption of risk where "[a]ssumption of

risk was definitely not important in th[e] case [when t]here was no suggestion regarding it during the course of the trial.").

But in the end, this salutary principle can only be a starting point. Because assumption of risk and contributory negligence are similar doctrines, and because only the latter is a defense under the FELA, we recognize that sometimes the absence of an explanation of the differences between the doctrines will confuse the jury as to the governing law. And, following that logic, we have held that when the facts of the case present a danger of jury confusion on the issue, an assumption of risk charge should be given. Thus, in Koshorek v. Pennsylvania R.R. Co., the only evidence concerning the plaintiff's negligence consisted of his continuing to work in a dusty shop when he "either knew or should have known that inhalation of excessive dust over an extended period of time might cause him harm." 318 F.2d at 369. The district court refused to give an assumption of risk charge and the jury returned a verdict for the railroad. We reversed because "[h]ad an adequate distinction between conduct constituting contributory negligence and that which would have constituted assumption of risk been pointed to the jurors in the charge, the jury might well have reached a different verdict." Id. at 369-70.

Thus, the most we can say as a matter of law is that when the evidence adduced at trial presents a danger that the jury might reduce a plaintiff's recovery based on the

impermissible theory of assumption of risk, then the trial judge should instruct the jury on how that doctrine differs from contributory negligence.  But when the evidence presents no such danger, then an adequate charge on contributory and comparative negligence suffices.  Of course, the most difficult part of the inquiry is determining when the facts merit an assumption of the risk instruction.  To answer this question, we must inquire into what Congress meant by the phrase "assumption of risk."  Only then will we be able to categorize the evidence and determine whether such a charge should have been given.

### 3.  Assumption of the Risk Generally

> At common law an employee's voluntary, knowledgeable acceptance of a dangerous condition that is necessary for him to perform his duties constitutes an assumption of risk.  Contributory negligence, in contrast, is a careless act or omission on the plaintiff's part tending to add new dangers to conditions that the employer negligently created or permitted to exist.

Taylor v. Burlington N. R.R. Co., 787 F.2d 1309, 1316 (9th Cir. 1986) (citations omitted).  Despite this seemingly simple definition, courts have a difficult time distinguishing between assumption of the risk and contributory negligence.  This difficulty is certainly due in large part to the fact that the "assumption of risk" concept of voluntarily and knowingly accepting a dangerous condition often is used as an umbrella term to describe a number of discrete and dissimilar concepts.  See

Schwartz, Comparative Negligence, § 9-1(a) at 187; W. Page Keeton, et. al., Prosser and Keeton on Torts, § 68 at 480 (5th ed. 1984). For example, in some cases assumption of risk describes a party's express contractual agreement to assume a risk; under this scenario, "the defendant is relieved of a legal duty to the plaintiff." Prosser and Keeton on Torts, § 68 at 481. Other times the phrase is used as a legal fiction under which, based on the circumstances, a party is deemed implicitly to have consented to bear particular kinds of risk. For example, a railroad worker might be said to have assumed the risks inherent in working in a dangerous occupation. The umbrella category of assumptions of risk also divides into the subcategories of reasonable assumptions of risk and unreasonable assumptions of risk. See Schwartz, § 9-4(c)(2) at 214; Smith v. Seven Springs Farm, Inc., 716 F.2d 1002, 1005 (3d Cir. 1983). Thus, when an expert skier traverses an extremely difficult slope, he may be said reasonably to have assumed the risk inherent in skiing a difficult slope. Id. at 1009. But when a novice consciously chooses the difficult slope, his actions probably would be characterized as unreasonable. Thus, a person's implicit consent to undertake a risk can be either reasonable or unreasonable. As a corollary, an individual who accepts a dangerous employment at a high wage might be said to be acting reasonably. But a person who accepts the identical

employment for a lower wage and with minimal safety precautions might be said to be acting unreasonably.

The subcategory of unreasonable assumption of risk sounds suspiciously like a negligence concept.  In fact, in such cases -- where the plaintiff unreasonably assumed a known risk -- the difference between assumption of risk and contributory negligence appears purely semantic.  Rather than saying the skier assumed a risk, we easily could say that he failed to act with due care.  See Prosser and Keeton on Torts, § 68 at 481 (equating unreasonable assumption of risk with contributory negligence).  The point is crucial, because it means there are times when a description of the defense of assumption of the risk "overlaps with [a description of] the defense of contributory negligence." Smith, 716 F.2d at 1006.  In such cases, evidence supporting one theory also constitutes evidence of the other.  Thus, depending on how courts characterize such evidence, a jury either may be permitted to reduce the plaintiff's recovery or be barred completely from considering such evidence.  Thus, our next inquiry must be into just what theory of assumption of risk Congress sought to prohibit when it barred the defense under the FELA.  To answer the question, we turn first to the history behind Congress' initial allowing and subsequent elimination of the assumption of risk defense under FELA, and then we consider the pertinent interpretative caselaw.

## 4. Assumption of the Risk Under FELA

During the beginnings of industrial growth in the 19th century, and prior to the enactment of FELA and other legislation protecting employees, the common law governing employment injuries "was heavily stacked against employees." Daniel Saphire, Two Views on FELA and Railroad Safety, 19 Transp. L. J. 401, 402 (1991). Specifically, the common law courts had devised rules "to insulate the employer as much as possible from bearing the 'human overhead' which is an inevitable part of the cost -- to someone -- of the doing of industrialized business." Tiller, 318 U.S. at 59, 63 S.Ct. at 447. Thus, for example, "a plaintiff's contributory negligence barred any subsequent recovery for damages, even if the plaintiff was only slightly at fault." Monk v. Virgin Islands Water & Power Authority, 1995 WL 231637 at * 2 (3d Cir. April 20, 1995). The point, in part, was "to give maximum freedom to expanding industry," Tiller, 318 U.S. at 59, 63 S.Ct. at 447, in the belief that "optimal economic growth could occur only when the government did not interfere unduly with the free workings of the marketplace." Jane P. North, Comment: Employees' Assumption of Risk: Real or Illusory Choice, 52 Tenn. L. Rev. 35, 39 (1984). The doctrine of assumption of the risk was one of those barriers erected against this background. The doctrine, which "prevented recovery when a plaintiff was deemed to have assumed the risk of a known danger," Monk, 1995 WL 231637 at * 2 (citing W. Page Keeton et al.,

Prosser & Keeton on the Law of Torts, § 68, at 495-96 (5th ed. 1984)), really was "a judicially created . . . 'rule of public policy, [developed because] an opposite doctrine would not only subject employers to considerable and often ruinous responsibilities, thereby embarrassing all branches of business,' but would also encourage carelessness on the part of the employee." Tiller, 318 U.S. at 58-59, 63 S.Ct. at 447 (citations and footnotes omitted).

The Supreme Court summed up the meaning of the concept in the pre-FELA case of Tuttle v. Detroit, G.H. & M. Ry. Co., 122 U.S. 189, 7 S.Ct. 1166 (1887), when it declined to allow a jury to inquire into the reasonableness of a railroad's choice of machinery. It explained its decision as follows:

> The brakemen and others employed to work in such situations must decide for themselves whether they will encounter the hazards incidental thereto; and, if they decide to do so, they must be content to assume the risks. . . . . 'A railroad yard, where trains are made up, necessarily has a great number of tracks and switches close to one another, and any one who enters the service of a railroad company connected with the moving of trains assumes the risk of that condition of things.' It is for those who enter into such employments to exercise all that care and caution which the perils of the business in each case demand.

Id. at 194-95, 7 S.Ct. at 1168 (emphasis added) (citation omitted). Thus, assumption of risk in the employment context described the notion of implied consent -- when an employee takes a job, he or she consents to assume the risk of any danger he or

she knows or should know necessarily is entailed in the job.  In a sense the doctrine estopped the employee from blaming the employer for an injury resulting from a risk contemplated by the parties when they fashioned their employment contract.  The Court in fact explicitly relied on this quasi-contract basis for the doctrine: "'[T]he servant, when he engages in the employment, does so in view of all the incidental hazards, and . . . he and his employer, when making their negotiations, -- fixing the terms and agreeing upon the compensation that shall be paid to him, -- must have contemplated these as having an important bearing upon their stipulations.  As the servant then knows that he will be exposed to the incidental risk, he must be supposed to have contracted that, as between himself and the master, he would run this risk.'"  Id. at 195-96, 7 S.Ct. at 1168-69 (citation omitted).  Therefore in an action claiming damages because of one's employer's negligence, "although an employer may have violated the duty of care which he owed his employee, he could nevertheless escape liability for damages resulting from his negligence if the employee, by accepting or continuing in the employment with 'notice' of such negligence, 'assumed the risk.'"  Tiller, 318 U.S. at 69, 63 S.Ct. at 452 (Frankfurter, J., concurring).

In a case decided after the original FELA was enacted -- when assumption of the risk remained a complete defense to the railroad's negligence -- the Supreme Court distinguished

assumption of the risk from contributory negligence and again described assumption of risk in implied consent terms. "Contributory negligence involves the notion of some fault or breach of duty on the part of the employee." Seaboard Air Line Ry. v. Horton, 233 U.S. at 503, 34 S.Ct. at 639-40. Assumption of the risk, on the other hand, "may be free from any suggestion of fault or negligence on the part of the employee." Rather, "employments [that] are necessarily fraught with danger to the workman . . . are normally and necessarily incident to the occupation [and] are presumably taken into account in fixing the rate of wages." Id. at 504, 34 S.Ct. at 640. Assumption of the risk again referred to risks to which the plaintiff implicitly consented in taking the employment; other than that, the plaintiff was charged with acting as a prudent person under the circumstances.

Tiller, the seminal case that first interpreted the 1939 FELA amendment, canvassed the history of the assumption of the risk defense, and explained it in implied consent terms. The Court noted that assumption of the risk originally was included in the FELA "because of acceptance of the theory that the employee's compensation was based upon the added risk to his position and that he could quit when he pleased." Tiller, 318 U.S. at 61, 63 S.Ct. at 448. But, the Court noted, in adopting the amendments, "[t]he report of the Senate Judiciary Committee struck at the basic reasons advanced by common law courts for the

existence of the doctrine, declared it unsuited to present day activities, and described them as out of harmony with the equitable principles which should govern determinations of employer-employee responsibilities." Id. at 64-65, 63 S.Ct. at 450 (citing Senate report).

Thus, Supreme Court cases from the pre-FELA, pre-amendment and post-amendment eras all contemplated that assumption of risk under the FELA referred to the employee's implied consent to assume the risks entailed in employment. So Congress in adopting the 1939 amendments sought to prevent juries from reducing a plaintiff's recovery because the plaintiff performed a dangerous task or a dangerous job rather than quit or find employment elsewhere.

### 5. Refining the distinctions

Various courts have refined the distinction between assumption of risk and contributory negligence under the FELA in the last few decades. In the oft-cited Taylor v. Burlington N. R.R. Co., 787 F.2d 1309, a case in which the plaintiff claimed injuries resulting from harassment by his supervisor, the railroad argued that the plaintiff's failure to "bid off" to another work area where he would work under a different supervisor, constituted contributory negligence. The court disagreed, holding that "[t]he employee who enters the workplace for a routine assignment in compliance with the orders and

directions of his employer or its supervising agents, who by such entry incurs risks not extraordinary in scope, is not contributorily negligent, but rather is engaging in an assumption of risk."  Id. at 1316.  Assumption of risk as the court described it thus was comprised of the plaintiff's implicit consent to the risks of employment; the employer could not reduce its liability by arguing that the plaintiff should not have performed the job.

In Rivera v. Farrell Lines, Inc., 474 F.2d 255 (2d Cir.), cert. denied, 414 U.S. 822, 94 S.Ct. 122 (1973),[3] the Court of Appeals for the Second Circuit also applied the implied consent theory of assumption of risk.  In that case, the plaintiff slipped and fell on a wet pantry floor while performing his job of getting ice cream for a crew member.  The district court charged the jury that "appellant might have been contributorily negligent by not having 'the common sense to go and say to somebody in charge, "Look, this has got to be cleaned up; I won't work here until it is done."'"  Id. at 258 (quoting charge).  The court of appeals, noting that "unrebutted evidence . . . established that . . . numerous complaints about the situation in the pantry had been made to no avail," reasoned that

_____

[3].  Rivera arose under the Jones Act, but the standards governing the parties' conduct generally are the same under both the FELA and the Jones Act.  Kernan v. American Dredging Co., 355 U.S. 426, 439, 78 S.Ct. 394, 401 (1958) (Seaman "was in a position perfectly analogous to that of the railroad workers . . . and the principles governing [FELA] cases clearly should apply [under the Jones Act].").

"[i]t cannot be known whether further complaint by appellant would have resulted in correction of the drain defect in time to avoid the accident." Id. Thus, "if . . . contributory negligence is submitted to the jury on retrial . . . it should be done so only with a caveat that the appellant was not duty bound to perform a futile act." Id. In other words, if the employee could not reasonably expect the employer to correct the defect, then the employee had no real alternative but to perform the task, defect or not. But if reasonable safe alternatives were available -- such as if notification could have resulted in immediate correction of the problem, then it was not necessary for the employee to accept the dangerous condition. The employee could not be said to have implicitly consented to working in an unsafe work area, and his actions in failing to follow a safer alternative would constitute contributory negligence. Thus, when alternatives besides quitting are available to plaintiff, his actions are reviewed for reasonableness, and unreasonable assumptions of risk constitute evidence of contributory negligence. See also Joyce v. Atlantic Richfield Co., 651 F.2d 676, 683 (10th Cir. 1981) (adopting implied consent theory of assumption of the risk) (person is not guilty of contributory negligence "'simply because he acceded to the request or direction of the responsible representatives of his employer that he work at a dangerous job, or in a dangerous place, or under

unsafe conditions.'") (quoting Devitt and Blackmar, Fed. Jury Prac. and Instructions, §94.16 (3d ed.)).

The Court of Appeals for the Ninth Circuit recently applied these principles to the day to day relationships between supervisor and employee in Jenkins v. Union Pacific R.R. Co., 22 F.3d 206 (9th Cir. 1994). In that case, a railroad engineer was attempting to "shove a length of nine flatcars to a point where they would be coupled with other cars." Id. at 208. Because the engineer's locomotive was pushing (rather than pulling) the cars, the engineer was unable to observe the point of contact, and the plaintiff was asked to act as his eyes and ears. The plaintiff did this by boarding the front car. Because the engineer believed that the plaintiff was having difficulty boarding the car, he stepped on the brakes. But the other cars continued to move forward, and the plaintiff was "caught on the axle, pulled under the train, and thrown out onto the rail," suffering severe injuries. Id. at 209.

In making its analysis, the court distinguished between general orders and specific orders. "'Where a general order is given, an employee must use ordinary care in its execution, and the giving of the order does not affect the question whether the servant has been negligent in his manner of carrying it out, where there is a choice open to him.'" Id. at 211 (citation omitted) (emphasis added). In such cases, the plaintiff's actions are reviewable for contributory negligence. However,

when the employee is given a specific order -- that is, where he or she is told to perform a specific task in a particular way -- "he is not contributorily negligent; rather his conduct falls under the abolished doctrine of assumption of risk."  Id.  In other words, when a plaintiff has no real choice, his recovery should not be reduced because he performed the task, regardless of whether the plaintiff acted reasonably or unreasonably.  But when the plaintiff has reasonable alternatives available to him, he must act reasonably in performing his job.  And if he acts unreasonably, he is answerable for contributory negligence.

To illustrate, in that case, the employer produced evidence that the plaintiff violated company safety rules in performing the job in the manner in which he did.  Because this evidence supported the employer's argument that the plaintiff had a safer method of performing his job, the court "agree[d] with Union Pacific that the jury could rationally find that Jenkins contributed to his own injury by violating the operating rule."  Id. at 212.

Not all courts agree with the proposition that assumption of risk under the FELA describes the theory that the plaintiff implicitly has consented to the risks of his employment, and that when there are alternatives available the plaintiff must act reasonably.  The Court of Appeals for the Eighth Circuit, for example, took a more expansive view in Birchem v. Burlington N. R.R. Co., 812 F.2d 1047 (8th Cir. 1987).

There, the plaintiff used a defective "mudjack" despite knowing
of company safety rules "forbidding the use of unsafe or
defective equipment."  Id. at 1048-49.  In the court's view, the
district court properly rejected the railroad's proffered
instruction that the plaintiff's conduct evidenced negligence on
his part.  Rather, according to the court, "[t]he district court
properly admonished the jury during the trial that the Railroad's
theory was an impermissible effort to transfer to Birchem its
nondelegable duty to provide safe equipment and a safe working
environment."  Id. at 1049.  In so holding, the court necessarily
rejected the proposition that unreasonable assumptions of the
risk entailed in choosing one particular method of performing a
task may constitute contributory negligence.  It thus rejected
implied consent as the theory of assumption of risk under FELA.[4]

We are not persuaded by the Birchem court's analysis.
In our view, the history behind the FELA and the Supreme Court's
pronouncements in pre- and post-FELA cases makes clear that
assumption of risk in the employment context refers to implied
consent.  Taylor, Jenkins, and Rivera are in accord with that
principle and we find their analyses persuasive.  Thus, we hold
the following:  A plaintiff's recovery under the FELA never can

_____

[4].  Despite that language in the court's opinion, though, it
approved, without elaborating, the district court's instruction
that "evidence concerning the manner and way in which [plaintiff]
used the equipment was proper for its consideration."  Birchem,
812 F.2d at 1049.  It is difficult to see how a jury would
reconcile these instructions.

be reduced on the basis that he or she implicitly consented to the risk by accepting employment with the railroad or by performing a task in the manner which the employer directed. This is true regardless of whether the plaintiff acted reasonably or unreasonably. Thus, even when a jury examining a plaintiff's position objectively would conclude that he acted unreasonably in accepting employment, or performing a task at all, such unreasonable actions for FELA purposes are characterized as assumption of risk rather than contributory negligence.

But all other actions of plaintiff are "to be handled as though no doctrine of assumption of risk had ever existed," Tiller, 318 U.S. at 64, 63 S.Ct. at 450, and if they are evidence of negligence they should be admitted to show contributory negligence. Thus, when reasonable alternatives besides quitting or refusing to perform the task in an unsafe way are available, a plaintiff is charged with acting with due care and will be held responsible for acting unreasonably. In such circumstances "[w]hen the plaintiff unreasonably assumes a known risk, his fault in that regard is negligence and his damage award may be subject to apportionment." See Schwartz at § 9-4(c)(2) at 214; see also id. at § 9-4(a)(1) at 202 ("The language of the F.E.L.A. makes it clear that . . . only facts that would constitute unreasonable implied assumption of risk (as contrasted with reasonable) can serve to reduce the plaintiff's award."). Examples of evidence of contributory negligence include failing

to follow specific safety instructions reasonably calculated to protect the employee from the injury that occurred; failing to report a defect when the evidence establishes that such reporting would be productive; and failing to act prudently in performing the task.

Based on these principles, if no evidence of impermissible assumption of risk has reached the jury, a correct instruction on contributory negligence will do. However, if, either because of evidence introduced at trial or because of statements made by counsel in opening or closing arguments, there is a risk that the implied consent theory of assumption of the risk seeped its way into the case, the jury should be instructed that it "may not find contributory negligence on the part of the plaintiff . . . simply because he acceded to the request or direction of the responsible representatives of his employer that he work at a dangerous job, or in a dangerous place, or under unsafe conditions." Joyce, 651 F.2d at 683 (citation omitted).

We now turn to the facts of this case to determine whether there was a danger that the jury confused assumption of the risk with contributory negligence, and therefore that an assumption of risk charge should have been given.

## 6. Application Of the Law

Fashauer claims that defense counsel made a number of impermissible references in her opening and closing statements,

the net result of which enabled the jury to reduce his recovery based on an impermissible version of assumption of the risk.  He first argues that defense counsel's statement in her opening that "plaintiff is not a newcomer to the railroad," see app. 168, demonstrates an illicit attempt to bring assumption of risk into the case.  He buttresses the point by quoting counsel's argument that "[plaintiff] walked in that vestibule back and forth during the course of that day through the very spot that he later alleges he slipped in."  app. 169.

When counsel's statements are read amidst the surrounding context, however, it becomes clear that she was not interjecting assumption of risk into the case but instead attempting to show that:  (1) the vestibule's condition was the result not of New Jersey Transit's negligence but of normal conditions during the rain; and (2) Fashauer did not act with due care in walking through the wet vestibule.  For instance, she argued that "if you add up the total number of stops at the time this alleged incident happened, [the accident happened on] the 19th stop.  As you know on the stops passengers get on and off the train and it has been continuing to rain the entire day." App. 169.  Moreover, the references to Fashauer going in and out of the vestibule were intended to point out that despite his complaint about the soaked vestibule, "plaintiff never reported any leaking from the tube diaphragm into the vestibule area at any time before this accident happened."  Id.  That observation

was a legitimate attempt to rebut Fashauer's argument that the vestibule was unusually wet that day. Further, defense counsel's emphasis on the fact that Fashauer "wasn't holding on to any handholds whatsoever," in violation of company safety rules, see id. at 170, was a permissible argument advancing the defense of contributory negligence. If the jury believed the evidence, it could have found that Fashauer had a safer alternative to the manner in which he performed his task.

Next, Fashauer points to defense counsel's argument in her closing that:

> [i]t's common sense that plaintiff should have been expected to know that this floor was wet. Again I'm going to stress this, probably until you're sick of hearing that we know it was raining all day long. He had been out there for seven hours, at least. Windy, hurricane, rainy day, stormy. I mean passengers coming. You know there was two hundred passengers, the floor has to be wet. Plaintiff had to have known the floor was wet and that the rug was wet. He had to know the exact condition of the floor.

app. 892. But defense counsel did not use these observations to build an argument that Fashauer should not have performed his job. Rather, she argued that he acted unreasonably in performing the task in the manner in which he did, and that the condition Fashauer encountered was not abnormal and therefore not proximately caused by New Jersey Transit's negligence. After making the above-quoted statements, defense counsel segued into a discussion of the relevant safety rules, and argued that when Fashauer failed to follow them he contributed to the injury. See

app. 892-93.  To say that such an argument should not have been made would be "to water down or even eliminate the issue of contributory negligence."  DeChico v. Metro-North Commuter R.R., 758 F.2d at 861.  Indeed, if we precluded the argument we virtually would be preventing the jury from considering whether there were in fact reasonable safe alternatives for Fashauer to follow.  Id.; see also Jenkins, 22 F.3d at 212 (violating operating rule constitutes evidence of contributory negligence).

More problematic is the district court's description of the evidence in the case during its charge.  The court instructed the jury that "defendant . . . alleges that plaintiff contributed to the happening of the accident by his own negligence in moving about the vestibule and by failing to follow safety regulations."  App. 956.  The first part of the court's statement could be read to imply that Fashauer was contributorily negligent simply because he moved about the vestibule in the rain.  If the statement had gone unqualified, we might be inclined to agree with Fashauer that the charge permitted the jury to reduce his recovery based simply on the fact that he performed his job.  But the court did not issue its statement in a vacuum as it made the statement only after thoroughly describing the concepts of negligence and ordinary prudence.  Thus, the court was referring to the manner in which Fashauer walked through the vestibule, rather than to the simple fact that he walked through the vestibule.  Moreover, we have found nothing in the record

constituting an impermissible argument on assumption of risk as
we have defined it.  As in <u>Seaboldt</u> and <u>De Pascale</u>, "[t]here was
no suggestion regarding [assumption of risk] during the course of
the trial."  <u>De Pascale</u>, 180 F.2d at 827.  It therefore is
inconceivable to us that the jury would <u>sua</u> <u>sponte</u> have taken it
upon itself to manufacture an additional defense.

To summarize, we do not believe that the charge as a
whole was confusing to the jury on this point.  We therefore
reject Fashauer's argument that the district court erred by
failing to instruct the jury that assumption of risk is not a
defense under the FELA.

## B.  Charge on Contributory Negligence

Fashauer next contends that the district court gave a
defective charge on the standard for contributory negligence.  As
indicated above, the question on review is whether the charge,
taken as a whole, correctly stated the applicable law.  Here, the
question really is one of law -- defining the concept of
contributory negligence.  The district court instructed the jury
as follows:

> To determine whether the plaintiff was
> contributorily negligent, you apply the same
> definition of negligence discussed earlier.
> That is did the plaintiff take or fail to
> take actions which a reasonably prudent
> person would have taken in the circumstances.
> You also apply the same rule of causation.
> That is <u>did plaintiff's negligence, if any,</u>
> <u>play any part in bringing about his injuries</u>.
> Although I have instructed you that plaintiff
> has the burden of proving its case by a

preponderance of the evidence, it is the
defendant which has the burden of proving
also by a preponderance of the evidence that
plaintiff was contributorily negligent.

App. 960-61 (emphasis added).  The court previously defined

negligence as follows:

Negligence is simply the failure to use the
same degree of care which a person of
ordinary prudence would use in the
circumstances of a given situation.  It could
be the doing of something which a reasonably
prudent person would not have done, or
failing to do something which a reasonably
prudent person would have done under the
circumstances.  The definition of negligence
requires the defendant to guard against those
risks or dangers of which it knew or by the
exercise of due care should have known.

App. 957.

Fashauer contends that the court erred in "impos[ing] a

standard of causation in dealing with the issue of plaintiff's

contributory negligence that is significantly more harsh than the

standard that would be applied under the common law."  Br. at 23.

Fashauer also appears to take issue with the court's duty of care

instruction; he contends that under the FELA he has only a slight

duty to protect himself, and thus the court erred in holding him

to the same standard of care as the railroad.  The district

court, in its opinion ruling on Fashauer's motion for a new

trial, followed the language of the statute, a Pennsylvania

district court case, and a case from the Sixth Circuit to hold

that the same causation and care standards apply to both employer

and employee.  It noted, though, that "I personally find it very

problematic that in a remedial statute designed to protect the working man and working woman, that you should apply, in effect, an enhanced contributorily negligent [sic] statute, because that's the effect. You're putting a heavier burden on the worker than even the common-law would have put on it." Op. at 68.

In the first place, we are puzzled by Fashauer's contention and the district court's concern regarding the causation instruction. It must be remembered that under the pre-FELA common law, contributory negligence totally barred a plaintiff from any recovery. Thus, in that scenario, the proposition that a plaintiff is contributorily negligent if his negligence played any part at all in causing the injury at times would have worked draconian consequences. But the FELA modified the common law; it contains a comparative negligence scheme which reduces plaintiff's recovery only in proportion to his share of responsibility for the injury. In short, while the standards of causation differ, so do the results of a finding of contributory negligence. As the district court instructed the jury: "[A]ssuming that you find . . . that plaintiff was negligent and that his negligence played a part in causing his own injuries, you must then determine the percentage to which plaintiff's negligence, if any, contributed to his injuries." App. 961. Thus, a jury finding of contributory negligence does no harm to the plaintiff unless it makes a further finding that the plaintiff's fault contributed to the injury to a particular

degree.  In other words, if a plaintiff's negligence contributed only marginally to the injury, his recovery would be reduced only marginally.  Since the jury found that Fashauer was 50% responsible for his injury, it obviously found that he was more than marginally responsible.  Therefore, in a pure comparative negligence scheme such as FELA's, Fashauer's argument is insubstantial.

We also disagree with Fashauer's contention that a FELA plaintiff is held to a lesser standard of care than his employer, notwithstanding the district court's invitation to us to reverse on this ground.  See op. at 68-69 ("I welcome the insight, guidance, and even reversal from the Third Circuit on this issue.").  In the first place, it is unclear what it means to say that a plaintiff has only a slight duty to protect himself.  It seems to us that someone acts either with due care or without due care.  The FELA is neither a worker's compensation statute nor a strict liability statute, and absent explicit direction from Congress or the Supreme Court, we decline to turn it into one.

More importantly, our interpretation is confirmed by the language of the statute.  By its very terms, the FELA provides that "the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."  45 U.S.C. § 53.  The statute does not distinguish between degrees of negligence; the statute does not say that the plaintiff only has a slight duty of care.  Under the statute, a

plaintiff's recovery is reduced to the extent that he is negligent and that such negligence is responsible for the injury. In such a situation, one must assume that Congress intended its words to mean what they ordinarily are taken to mean -- a person is negligent if he or she fails to act as an ordinarily prudent person would act in similar circumstances. Such a reading also is in accord with the FELA's pure comparative negligence scheme; and to adopt Fashauer's argument would be to abandon the clear dictate of the statute in favor of a policy decision to favor employees over employers.

Our interpretation finds further support in precedents of this court and others. In the Jones Act case of Mroz v. Dravo Corp., 429 F.2d 1156 (3d Cir. 1970), the appellant contended that the district court erred by charging the jury on contributory negligence. In rejecting the argument, we reasoned:

> [C]ontributory negligence is the neglect of the duty imposed upon a person to exercise ordinary care for his own protection and safety which is a legally contributing cause of an injury. In determining whether an injured person has been guilty of contributory negligence the standard of conduct to which he must conform is that of a reasonably prudent person under the circumstances. If a person by his own action subjects himself unnecessarily to danger which should have been anticipated and is injured thereby he is guilty of contributory negligence.

Id. at 1163. Fashauer's argument that different duties of care apply is directly contrary to this language, which applies the

same standard of care to both employer and employee.  Other courts similarly have ruled.  See Karvelis v. Constellation Lines S.A., 806 F.2d 49, 52-53 & n.2 (2d Cir. 1986) (approving jury instruction charging that both plaintiff and defendant are required to act with reasonable care), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891 (1987); Brown v. OMI Corp., 863 F. Supp. 169, 170-71 (S.D.N.Y. 1994) (applying reasonable care standard to defendant's contributory negligence claims).

To be sure, Fashauer's contention derives support from a series of Jones Act cases decided in the Fifth Circuit.  Under the standard enunciated in those cases, "a seaman's duty to protect himself is not ordinary care, but slight care."  Brooks v. Great Lakes Dredge-Dock Co., 754 F.2d 536, 538 (5th Cir. 1984) (citing cases), modified on other grounds, 754 F.2d 539 (5th Cir. 1985). In Brooks, for example, the court of appeals found reversible error in an instruction that "contributory negligence is the failure on the part of the injured party to use ordinary care for his own safety under the circumstances at the time and place in question."  Id. (emphasis added); see also Bobb v. Modern Prods., Inc., 648 F.2d 1051, 1057 (5th Cir. 1981).  But we find those cases unpersuasive in light of the FELA's explicit language and comparative negligence scheme, and further note that it is unclear whether the slight care standard is viable in the Fifth Circuit itself.  In a more recent discussion of the question, that court of appeals said in rather explicit terms

that "the same general negligence ('ordinary prudence') and causation standards apply to both employer and employee in Federal Employers' Liability Act (and, by extension, Jones Act) cases." Gavagan v. United States, 955 F.2d 1016, 1019 n.7 (5th Cir. 1992).

We find no error in the district court's contributory negligence charge.

### C.   Future lost earnings capacity

Fashauer next argues that the district court erred in its jury instruction on future lost earnings.  It is settled law that in a FELA case, a plaintiff may recover compensatory damages for lost earning capacity.  Wiles v. New York, Chicago and St. Louis R.R. Co., 283 F.2d 328, 332 (3d Cir. 1960), cert. denied, 364 U.S. 900, 81 S.Ct. 232 (1960); Gorniak v. National R.R. Passenger Corp., 889 F.2d 481, 483 (3d Cir. 1989); see also McNight v. General Motors Corp., 973 F.2d 1366, 1370 (7th Cir. 1992), cert. denied, ____ U.S. ____, 113 S.Ct. 1270 (1993). Under that theory of damages, if a plaintiff "show[s] that his injury has caused a diminution in his ability to earn a living," he or she may recover damages covering the extent to which the railroad's negligence caused the diminution in earning capacity. However, such recovery is appropriate only where the plaintiff "has produced competent evidence suggesting that his injuries

have narrowed the range of economic opportunities available to him."  Gorniak, 889 F.2d at 484.

In Gorniak, we discussed what such evidence must entail, and, after canvassing the relevant caselaw, concluded that a plaintiff may prove impaired earning capacity by presenting evidence of "a decreased ability to weather adverse economic circumstances, such as a discharge or lay-off, or [a decreased ability] to voluntarily leave the defendant employer for other employment."  Id.  In Wiles, for example, the plaintiff, as a result of the defendant's negligence, had undergone numerous operations and wound up with substantial and ineradicable scars in his back, and a permanent minor back deformity.  While he remained employed by the railroad as a car repairman, his medical expert testified that "he would have difficulty getting a job in heavy industry elsewhere than with the Railroad" because physical examinations, generally required by such employers, "would compel Wiles to disclose the nature of his operations and that he had a history of disc protrusion and back fusion and these disclosures would militate against his securing employment."  Wiles, 283 F.2d at 331.  Based on this testimony, we held that, although Wiles was earning more in his current position than in his position at the time of his injury, he had no protection against being discharged or laid off.  And if one of those contingencies occurred, he would face the consequences of a reduced ability to procure employment.  Id. at

332.  Additionally, "if [Wiles] cannot obtain gainful employment elsewhere he is chained to his present job in a kind of economic servitude."  Id.  In such circumstances, Wiles had shown evidence that his injuries limited his economic horizons.

The evidence in Gorniak was even stronger.  At the time of the injury, Amtrak employed the plaintiff as a materials handler.  At trial, the plaintiff introduced expert evidence that he "was subject to permanent physical restrictions . . . that would preclude him from working as a materials handler or store attendant in an Amtrak warehouse, and in many positions in the industrial workforce outside Amtrak."  Gorniak, 889 F.2d at 484.  Moreover, although after the injury Amtrak had given the plaintiff a position as a ticket clerk, he introduced evidence that because of the company's seniority system, if Amtrak cut down on its light duty force, he would be without a job.  In support of this fear, "evidence at trial indicate[d] that Amtrak has closed one if its Pennsylvania facilities and has abolished jobs in plaintiff's craft at another during Gorniak's employment with Amtrak."  Id. at 484.  Finally, we noted that "Gorniak . . . is under no obligation to remain with Amtrak, and the fact that his injuries hindered his ability to obtain other employment if he wished was one the jury could consider in deciding to award him damages."  Id.

Although we reject New Jersey Transit's argument that evidence supporting lost earnings capacity must come from a

vocational expert, we nevertheless agree that Fashauer has produced no "competence evidence" supporting his claim for these damages. The evidence consisted almost entirely of medical testimony, only tangentially related to Fashauer's economic horizons, that the accident caused a permanent injury to his shoulder that restricted his physical activity. See app. 444 (testimony of Dr. Gary Goldstein). For instance, Dr. Goldstein testified that because of the injury, Fashauer cannot lift weights over 20 pounds above his waist level and therefore "can't do any activities that would involve reaching overhead with even minimal power." Id. Thus, Fashauer was unable to continue working as a trainman or brakeman. Id. at 445. Fashauer himself testified that his inability to lift his arm very high prevented him from performing his prior work at the railroad. App. 221.

But Fashauer does not refer to testimony that he would have difficulty obtaining work with a different employer, or that jobs he could do after the injury were less lucrative than his railroad job. No witness even opined that Fashauer's injury limited his economic potential. On appeal, Fashauer points to nothing specific in the record which would constitute evidence from which a jury could calculate such damages. The jury had no information from which to conclude that Fashauer's economic horizons were limited. He essentially wanted the jury to take his counsel's word for it.

At any rate, contrary to Fashauer's argument, the district court's charge, read in its entirety, adequately instructed the jury on loss of future earning capacity.  Fashauer points to various portions of the district court's charge that he contends permitted the jury to award future damages only for the time he was unable to work at all.  But the charge is not so limited.  For instance, the court said to the jury:

> [Y]ou next have to fix the amount of the loss.  You do this by considering the length of time during which plaintiff was not able to work.  The length of time he'll be unable to work in the future.  What his income was before the injuries and <u>the extent that any physical impairments resulting from injuries may lessen or decrease his income, should he return to the work force</u>.

App. 963 (court's jury charge) (emphasis added).  While the court first referred to damages while Fashauer was unable to work, it then plainly instructed the jury to consider whether Fashauer's income would decrease if he does return to work.  It appears that the judge categorized damages based on inability to work and damages based on a decreased earning capacity as separate measures of damages.  The court continued:

> If you decide . . . that it is reasonable that plaintiff will lose income in the future because he has not been able to return to work, then you should also include an amount to make up for those lost wages.  In deciding how much your verdict should be to cover future lost income, think about the factors mentioned in discussing past earning losses, such as the nature, extent and duration of his injury.  Also consider the plaintiff's age today, his general state of health before the accident, how long you reasonably expect

> the loss of income to continue and how much plaintiff can earn in any available job that he . . . physically will be able to do.

App. 964-65. Here again, it is clear that the court separated the two measures of damages -- damages based on an inability to work and damages based on impaired earning capacity in the future. But it certainly did not say that the former is the exclusive measure of future lost income damages. In discussing the law regarding awards of fringe benefits, the court instructed:

> [Fringe benefits are] benefit[s] that you should include in your award for each future year, if any, in which you find plaintiff will likely be unable to return to work. . . . If you find that at some point in time plaintiff should be able to return to work, but at a lower paying position[,] in fixing the amount of the future wage loss, you should consider not only the difference in pay rates, but the possible lower value of any fringe benefits available to plaintiff in his new position.

App. 966. Again, the "confusion" Fashauer perceives in the charge derives from the court's decision to distinguish the two measures of damages. It is difficult to see how a jury could be confused by an instruction which repeatedly asks it to consider loss of earning capacity. We reject Fashauer's argument.

## D. Rebuttal Witness

Fashauer next contends that the district court erred in refusing to permit him to call a rebuttal witness who was not

listed in the pretrial orders.  His contention builds upon the
following procedural background.

In the pretrial order, New Jersey Transit named Dr.
Morris Ehrenreich as a vocational expert.  Ehrenreich was slated
to testify that based on doctors' reports about Fashauer's work
abilities and a job search conducted in the New Jersey area,
Fashauer had numerous employment opportunities.  Nothing in the
pretrial summary of testimony indicated that Ehrenreich had
conducted a job search by answering classified advertisements in
newspapers.  At trial, however, when defense counsel asked
Ehrenreich about the methods he used to gauge Fashauer's ability
to gain employment, the following colloquy ensued:

> Q:   And what did you do?
> A:   I did a laborer survey, a laborer
> survey, which looked at the jobs available to
> him in this community, and, in fact, I found
> him a -- employer who's ready to interview
> him for a job if he wishes.
>
> Q:   And what job is that?
>
> A:   This was a job as a salesman for a car
> dealership.  I spoke to the manager who
> suggested that Mr. -- that if he's interested
> in the job, he can come down and apply for
> the job and indicated that the average
> salesman for this dealership earns between 30
> and $70,000 a year.

App. 778-79.

Subsequent questioning by the court revealed that
Ehrenreich had discovered this "job opportunity" by responding to
newspaper advertisements in the Asbury Park Press the day before

he testified.  Moreover, the court's further questioning revealed that while the trial was proceeding, New Jersey Transit's counsel had supplied Ehrenreich with the newspapers, thereby assisting Ehrenreich in the untimely job search.[5]  In other words, as the court later put it, Ehrenreich, with New Jersey Transit's cooperation, amended his report during the trial without notice to Fashauer's counsel.

---

[5].  The court questioned the witness as follows:

> THE COURT:  What made you call up [the Jaguar company]?
>
> THE WITNESS:  They had an ad in the paper offering jobs with training.
>
> THE COURT:    Well, there's hundreds of ads in the paper every day. . . . What made you pick that one?
>
> THE WITNESS:  Well, I got the job from Friday from the Asbury News.
>
> THE COURT:    From when?
>
> THE WITNESS:  This past Friday.
>
> THE COURT:    So, this was just done this Friday?
>
> THE WITNESS:  Yes.  And it was a -- many of the jobs require that you -- that you fax them a resume or you send a resume in.
>
>                      *   *   *
>
> THE COURT:    And this you did last Friday?
>
> THE WITNESS:  This I did on Monday.

App. 780-82.

Immediately upon discovering that the witness had testified about a survey not mentioned in the pretrial report, the court practically invited Fashauer to object to the testimony. Nonetheless, his counsel explicitly declined to object, informing the court that "I'm not objecting." App. 782.[6] Subsequently, out of the presence of the jury, the court severely rebuked New Jersey Transit and the expert:

> THE COURT: I think harm has been done to slip by the notion that to have this witness, in effect, work on his report, because that's what he's doing when he's making the calls. He's working on his report. He's modifying his report when he gets up there and says there is a car dealership that would interview this man. He's modifying his report.

---

[6]. The relevant passage was as follows:

> Q: Did you make any other calls previously to them?
>
> A: Not really.
>
> THE COURT: Do you have something to say?
>
> MR. BARISH: No.
>
> THE COURT: I'm sorry.
>
> MR. BARISH: I started to.
>
> THE COURT: Either you object or you don't object. Your motions don't mean --
>
> MR. BARISH: I'm not objecting.
>
> THE COURT: Okay. Ask your next question.

App. 782.

> I might add he didn't say till I questioned him when that was done. Only in response to my questions did it come out he did it yesterday. It is yesterday, really yesterday, not just -- I'm shocked and stunned that a witness would be put on the stand.
>
>       \*   \*   \*
>
> [I]t's another example of [sic] this case of, in effect, trial by ambush, and the idea is to say -- I don't have to repeat that I don't like it.

App. 798. Instead of objecting to the testimony or requesting the court to give a limiting instruction, Fashauer's counsel elected to cross-examine Ehrenreich about the substance of his telephone call to the dealership salesman.

After Ehrenreich finished testifying -- and after the court again rebuked New Jersey Transit -- Fashauer's counsel requested leave to present a rebuttal witness, who was to testify that "he conducted a job search through the agencies, through a number of sources of his business, through the State of New Jersey, and that there were no jobs . . . presently available that Mr. Fashauer could receive." App. 859. The district court denied the motion, reasoning that "I think [Dr. Ehrenreich's] testimony was so ludicrous that it's just inconceivable to me that the jury got anything out of it." App. 861. Thus, "I'm making the judgment that [Dr. Ehrenreich's testimony] is so laughably ludicrous that I don't think you need -- that it requires rebuttal." App. 861-62.

In its ruling on Fashauer's post-trial motions, the district court amplified the reasons behind its decision to preclude the rebuttal testimony. In that opinion, the court questioned Fashauer's counsel's motive in requesting leave to call a rebuttal witness. Noting that his rebuttal witness "apparently was in court ready to go" when Ehrenreich gave his surprise testimony, see op. at 76, the court pointed out that "[t]here's absolutely nothing [the witness] could have said about that. . . . He couldn't say, I called the same Jaguar salesman, and he said No, there is no job." Op. at 77. Therefore, according to the court, Fashauer was using the testimony as an artificial justification for testimony rebutting Ehrenreich's general testimony about Fashauer's employability, as Fashauer must have planned to call the rebuttal witness without regard to whether Ehrenreich gave surprise testimony. As the court put it, "[t]he only thing that was new in Dr. Ehrenreich's testimony that hadn't been in his original report was that he looked in the want ads and found a Jaguar salesman." Id. Therefore, the rebuttal witness could have been named in the pretrial report. The court concluded that "what we had here was a tactical decision made by the plaintiff to get the last word in by withholding his own expert and then springing him at the end. . . . What was really wanted by the plaintiff was to put its vocational expert last and get the last shot at the jury, and I don't think that's a proper use of rebuttal." Op. at 76-78.

Boiled down to its essence, the question before us is whether, in light of the manner of the proceedings, the district court erred in refusing to allow Fashauer to call a rebuttal witness who was not listed in the pretrial orders. "[T]he trial court ha[s] the discretion to exclude testimony of a witness who had not been identified. The trial court's exclusion of testimony because of the failure of counsel to adhere to a pretrial order will not be disturbed on appeal absent a clear abuse of discretion." Semper v. Santos, 845 F.2d 1233, 1238 (3d Cir. 1988); see also Greate Bay Hotel & Casino v. Tose, 34 F.3d 1227, 1236 (3d Cir. 1994). As we have explained, "[o]ne of the main purposes of the pretrial conference is to formulate the issues to be litigated to aid the parties in preparation for trial. If counsel are permitted to change the positions taken at pretrial obviously the effectiveness of this procedure is destroyed." Ely v. Reading Co., 424 F.2d 758, 763 (3d Cir. 1970).

Here, we find no abuse of discretion in the district court's decision. Fashauer contends that rebuttal was required to dispel the notion left by Ehrenreich's testimony that he was a malingerer. However, the district court's finding that plaintiff's counsel was using the rebuttal witness to rebut anticipated testimony and simply get the last word, is not clearly erroneous. That being the case, Fashauer "'from the outset of this action knew the [defendant's] contentions and the

necessity for . . . rebuttal testimony could reasonably have been anticipated.'" American Int'l Trading Corp. v. Petroleos Mexicanos, 835 F.2d 536, 538 (5th Cir. 1987) (internal alterations omitted) (alteration added) (citation omitted). Therefore, the district court acted within its discretion in refusing to allow the rebuttal expert to testify.

We stress that the decision to exclude the rebuttal expert had nothing to do with the content of Ehrenreich's testimony, and nothing we say should be read to approve his testimony. However, the record shows that Fashauer did not object to the testimony, did not request a limiting instruction, and was intending to use the witness to rebut anticipated testimony rather than the surprise testimony. Fashauer chose to cross-examine Ehrenreich in the hopes of discrediting him. He cannot capitalize now on his tactical choice by getting improper rebuttal before the court.


### E.  Mitigation of Damages

Finally, Fashauer contends that the district court erred in neglecting to instruct the jury that New Jersey Transit had the burden of proving that Fashauer failed to mitigate his damages. Under the FELA, which is to be interpreted according to "general principles of law as administered in the federal courts . . . an injured plaintiff has a duty to mitigate his damages." Jones v. Consolidated Rail Corp., 800 F.2d 590, 593 (6th Cir.

1986).  However, "once it is established that a duty to mitigate is present, the burden . . . falls on the wrongdoer to show that the damages were lessened or might have been lessened by the plaintiff."  Id. at 593; DeBiasio v. Illinois Central R.R., 52 F.3d 678, 688 (7th Cir. 1995) (same); Jackson v. City of Cookeville, 31 F.3d 1354, 1359 (6th Cir. 1994) (same); Schneider v. National R.R. Passenger Corp., 987 F.2d 132, 136 (2d Cir. 1993).  The district court instructed the jury that "[p]laintiff . . . must try to minimize the damages due to loss of wages.  But extraordinary or impractical efforts are not necessary.  All that is required are reasonable efforts and ordinary care in trying to reduce the loss."  App. 963.  The district court's charge, while correctly stating that Fashauer had a duty to mitigate, failed to specify that New Jersey Transit had the burden of proof on the issue.  Because the mitigation language occurred in the midst of the court's general damages instructions, the jury could well have believed that Fashauer had the burden to prove mitigation.  Therefore, the charge unquestionably was flawed.

However, Fashauer failed to request a charge on mitigation of damages, and, as the district court pointed out, "no one asked for that burden of proof charge.  Mr. Barish [plaintiff's counsel] admits, candidly, that he did not call to my attention at any of the various points that I have failed to do that."  Op. at 48.

Thus, while ordinarily an "[i]ncorrect jury instruction as to burden of proof 'is "fundamental and highly prejudicial" and requires a new trial,'" Waldorf v. Shuta, 896 F.2d 723, 730 (3d Cir. 1990) (citation omitted), that principle assumes that the issue properly has been preserved for appeal.  The procedure for preserving an objection to a jury charge is governed by Fed. R. Civ. P. 51 which provides that:

> At the close of the evidence . . . any party may file written requests that the court instruct the jury on the law as set forth in the requests.  The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.  The court, at its election, may instruct the jury before or after argument, or both.  No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection.

Fed. R. Civ. P. 51 (emphasis added).

We repeatedly have stressed the important policy objectives served by Rule 51.  The rule affords the trial judge "an opportunity to correct any error that may have been made in the charge before the jury begins its deliberations." Seman v. Coplay Cement Co., 26 F.3d 428, 436 (3d Cir. 1994); Miller v. CIGNA Corp., 47 F.3d 586, 591 n.5 (3d Cir. 1995) (in banc).  It also "lessen[s] the burden on appellate courts by diminishing the number of rulings at the trial which they may be called upon to review." McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750, 769

n.29 (3d Cir. 1990). Thus, Rule 51 is consistent with the general rule that "an appellate court will not predicate error on an issue upon which the district court was not provided with an opportunity to rule." Remington Rand Corp.- Delaware v. Business Sys., Inc., 830 F.2d 1260, 1267 (3d Cir. 1987). We have followed this proposition strictly, and have refused to consider "newly developed arguments[s] concerning [a] jury charge deficiency." McAdam, 896 F.2d at 769; see, e.g., Dunn v. HOVIC, 1 F.3d 1371, 1378 (3d Cir. 1993) (in banc) (declining to consider whether jury instruction was defective under Virgin Islands law because "th[e] issue was not properly preserved for appeal under Federal Rule of Civil Procedure 51"), cert. denied, ____ U.S. ____, 114 S.Ct. 650 (1993).

In the absence of a party's preservation of an assigned error for appeal, we review only for plain error, and our power to reverse is discretionary. Cf. United States v. Olano, 113 S.Ct. 1770, 1778 (1993) (interpreting Federal Rule of Criminal Procedure 52(b)). Consequently, "our discretionary power to review errors in jury instructions which were not objected to at trial should be exercised sparingly"; otherwise we risk "emasculat[ing]" the important policies served by Rule 51. McAdam, 896 F.2d at 770 n.31 (citing Trent v. Atlantic City Elec. Co., 334 F.2d 847, 859 (3d Cir. 1964)). Thus, we should notice the error only "'if [it] is fundamental and highly prejudicial or if the instructions are such that the jury is without adequate

guidance on a fundamental question and our failure to consider the error would result in a miscarriage of justice.'" Bereda v. Pickering Creek Indus. Park, Inc., 865 F.2d 49, 53 (3d Cir. 1989) (quoting United States v. 564.54 Acres of Land, 576 F.2d 983, 987 (3d Cir. 1978), rev'd on other grounds, 441 U.S. 506, 99 S.Ct. 1854 (1979)); Bennis v. Gable, 823 F.2d 723, 727 (3d Cir. 1987) (same).

We take guidance in this regard from the Supreme Court's recent interpretation of the Federal Rule of Criminal Procedure setting forth the plain error standard, Rule 52(b). The Court held that courts of appeal should exercise their discretion to "correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Olano, 113 S.Ct. at 1779 (quoting United States v. Atkinson, 297 U.S. 157, 160, 56 S.Ct. 391, 392 (1936)). If anything, the plain error power in the civil context -- which is judicially rather than statutorily created -- should be used even more sparingly. And in keeping with this, the Court of Appeals for the Second Circuit has held that the doctrine "should only be invoked with extreme caution in the civil context." United States v. Carson, 52 F.3d 1173, 1188 (2d Cir. 1995). The court continued: "plain error review is only appropriate in the civil context where the error is so serious and flagrant that it goes to the very integrity of the trial." Id. (citing Brenner v.

World Boxing Council, 675 F.2d 445, 456 (2d Cir.), cert. denied, 459 U.S. 835, 103 S.Ct. 79 (1980)).

We decline to exercise our discretion to reverse in this case, notwithstanding the importance of proper instructions on burdens of proof. In the first place, the instruction was quite cursory and not at all as detailed as mitigation instructions usually are and should be. The court did not tell the jury explicitly that Fashauer had a duty to mitigate. The court did not instruct the jury how to reduce the damages if it found Fashauer failed to mitigate. Thus, it seems doubtful that the instruction had the significance with which Fashauer endows it.

Moreover, Fashauer in his brief repeatedly confuses loss of future earnings capacity with the duty to mitigate damages. For example, he points to the fact that the jury awarded no damages for future lost earnings as evidence that the mitigation charge prejudiced him. But to the extent that the district court's mitigation charge referred to future earning potential, it was correct. The defendant is obligated to prove failure to mitigate, but that burden only applies to damages for past loss of earnings -- from the time of injury to the time of trial. As discussed in detail above, though, the plaintiff has the burden of proving future loss of earnings due to a diminished earnings capacity. Gorniak, 889 F.2d at 484. As Judge Bailey Brown pointed out in his concurrence in Jones v. Consolidated R.

Corp., 800 F.2d at 595, the "burden [i]s on the defendant to show that, after his injury and prior to the trial, [plaintiff] was able to do some work and did not make a reasonable effort to find and do such work."  But the burden remains on the plaintiff to prove "damage[s] as a result of a decrease in earning capacity which will reduce future income."  Id. (Brown, J., concurring).

Here, the jury awarded Fashauer $71,320 for past loss of earnings and he does not contend that this amount was inadequate.  Therefore, the fact that the jury awarded nothing for future loss of earnings only reflects that Fashauer failed to prove that element of damages.  We recognize that, as in Jones, the district court's charge did not adequately distinguish between past losses and future losses, but that hardly prejudiced Fashauer.  And it hardly affected the integrity of the trial.  We reject Fashauer's argument.

## III. CONCLUSION

For all the reasons detailed above, we will affirm the judgment of the district court.