## THE AMALIA.

(*District Court, D. Maine.* September 13, 1880.)

1. JURISDICTION—FOREIGN VESSEL—NATIONALITY OF CREW.—The nationality of a foreign vessel, and not that of the crew, should regulate the action of a court of admiralty in assuming jurisdiction over a controversy between the officers and seamen of such vessel.

    *The Nina,* 2 L. R. P. C. 39.

2. SAME—SAME—WAGES.—The district court, unless restricted by some treaty stipulation, may, in the exercise of its discretion, assume jurisdiction of a claim for wages against a foreign vessel.

3. SAME—SAME—FOREIGN CREW—TREATY WITH SWEDEN—8 U. S. ST. 352.—The thirteenth article of the treaty between Sweden and the United States, of July 4, 1827, (8 U. S. St. 346, 352,) provides "that each country shall have the right to appoint consuls, vice consuls, etc., in the commercial ports and places of the other country," and that such consuls, etc., "shall have the right, as such, to sit as judges and arbiters in such differences as may arise between the captain and crews of the vessel belonging to the nation whose interests are committed to their charge, without the interference of the local authorities." *Held,* that the district court was not thereby debarred from exercising its authority in a case within the terms of such treaty, where there was no consul, or other officer of Sweden, within the territorial jurisdiction of the court.

4. SEAMEN—CRUELTY OF MASTER—WAGES—DISCHARGE.—The master of a Swedish bark sailed from Gibraltar for Portland with an inadequate supply of provisions, whereby the laws of Sweden were violated, and the crew of the vessel compelled to endure great hardships and sickness for want of sufficient food. *Held,* that the crew were entitled to their discharge at Portland, before the expiration of the voyage for which they had shipped, and to the payment of the wages due them at the time of leaving the ship.

5. SAME—SAME—DAMAGES.—*Held,* further, that the seamen were entitled to one month's extra pay, by way of indemnity for the injuries they had sustained.

*Bird & Thomas,* for libellants.

*Webb & Haskell,* for claimants.

Fox, D. J. This libel is instituted by the second mate, steward, and all the seamen, praying to be discharged from further service in this bark, and for the payment of their wages, on account of a short allowance of provisions on a voyage of 124 days, from Alexandria, Egypt, to this port, and

also on account of ill-treatment by the officers of the ship. This vessel is under the Swedish flag, hailing from Hernosand, in Sweden. The master is a Swede. Some of the libellants are citizens of that country, while others are subjects of Denmark and Prussia. Some of the crew were shipped at Hernosand, and some in New York, all for a two-year voyage, (which time has not yet expired,) and until the vessel's return to Sweden. There being no consul or other representative of Sweden within the jurisdiction of this court, upon reading the libel it was deemed proper to grant process against the ship, then in the harbor of Portland. On the return day the master appeared and presented a preliminary objection to the court's further proceeding in the cause, for the reason that the ship was a foreign vessel, and her crew must be taken as belonging to the nationality of her flag, and that under such circumstances the district court should not interpose, in a controversy of this description, between a foreign ship and her crew.

In all differences between officers and crew of a foreign vessel, which have been presented to this court, the court has heretofore, in every instance, declined to assume jurisdiction whenever there has been within the district any representatives of the government to which such ship belonged, and has invariably remitted to such representative all such controversies for his determination. In all such cases the court has recognized the rule announced by the privy council in *The Nina*, 2 L. R. P. C. 39, that the nationality of the vessel, and not the nationality of any one of her crew, asking the interposition of the court, should regulate the action of the court; and all of the crew of this ship, for the purpose of this investigation, must be deemed Swedish subjects, notwithstanding it appears that some of them are in fact citizens of other nationalities.

It cannot admit of question that the district court, unless restricted by some treaty stipulation, has jurisdiction, in a case for wages, against a foreign vessel, and that the exercise of such jurisdiction is discretionary. In the exercise of such discretion the allegations found in this libel required of the court, in the absence of any Swedish respresentative, to

investigate the cause so far as to ascertain whether the facts and reasons alleged for the crew's discharge were established by the evidence. The cause, therefore, was allowed to proceed to a hearing, and at the close of the testimony of the libellants the attention of the court was first called to the thirteenth article of the treaty between Sweden and the United States, of July 4, 1827, in 8 U. S. St. 346, 352. By this article it was stipulated "that each country should have the right to appoint consuls, vice-consuls, etc., in the commercial ports and places of the other country," and that such consuls, etc., "shall have the right as such to sit as judges and arbiters, in such differences as may arise between the captain and crews of the vessel belonging to the nation whose interests are committed to their charge, without the interference of the local authorities."

This court is bound to recognize and obey this provision of the treaty as completely as if the same were contained in an act of congress, and the question which arises is whether, there being no consul or other officer of Sweden within this jurisdiction, the nearest being a vice-consul at Boston, this court is, by this provision of the treaty, debarred from exercising its authority in the present case. It seems quite clear to me that the court is not thus ousted of its jurisdiction. The purpose of this provision was to provide proper means of redress for the parties mentioned in the treaty, when difficulties should occur between them, and it was certainly judicious that such questions should be decided by the consul, or other officer of their respective countries conversant with the language of the disputants, and who may well be supposed to be acquainted with the laws and customs which should determine their respective claims; but, whenever the parties are in such a position that they cannot obtain the services of such an officer, can it be that it was the design of the treaty to leave them remediless, and to deprive the local tribunal of all authority to afford any redress, however urgent the occasion may be therefor?

If a Swedish vessel should be libelled in this court for supplies furnished here, for which she is liable, and is afterwards

sold by a decree of the court, can it be that the crew, by this provision of the treaty, are prohibited from proceeding for the recovery of their wages against the surplus which may remain in the registry, and that the court cannot decree the payment therefrom of their respective claims for wages, but must, if claims of subordinate rank are presented by our own citizens, allow such claimants to absorb the surplus, without power to afford the seaman any redress? I hold that a court of admiralty would require, in a treaty, the most positive, absolute prohibition against assuming jurisdiction in such a case, and would insist on language which would not admit of any doubtful signification, before it would acknowledge that its authority to protect the seaman was thus abrogated. If in any case the power still remains in the court, and it has authority to act when there is no consul within its jurisdiction, the authority must exist in all such cases; and it is only a question of judicial discretion whether the circumstances of any case are such as to require the court to interpose and take cognizance of the dispute.

The Amalia sailed from Hernosand the fourteenth of July for Lisbon, and from thence to New York, where she arrived November 24th. Five of the crew deserted, and some of the libellants were there shipped in their places. December 15th she sailed from New York for Alexandria, arriving at Gibraltar January 29th, remaining there three days, and reached Alexandria February 27th, sailed for this port April 23d, arriving at Gibraltar June 9th, from whence she sailed on the 12th, reaching this place August 25th, being 47 days from Alexandria to Gibraltar, and 74 from Gibraltar to Portland.

The law of Sweden regulates the supplies for a ship's crew, and at the time of shipment a small book is furnished each man, in which is entered an abstract of the Swedish law, and also the terms of his contract. All payments made to him in the course of the voyage are required to be entered thereon; a practice which might well be adopted in our merchant service. From this book it appears that each of the ship's crew is entitled to one and a half pounds of salt beef daily for three days, and three-quarters of a pound of salt pork daily

for the other four days in the week, together with eight pounds of bread, half a pound of wheat flour, three-quarters of a pound of butter, or 10 cubic inches of olive oil, and three-quarters of a pound of sugar, or one pound of molasses per week. Nine pints of water per day are also required. Tea or coffee, barley for soups, and other small stores are to be provided, about which there is no complaint of any deficiency. When in harbor a pound and a half of fresh meat may twice a week be substituted for the salted, and soup is to be furnished twice a week from fresh meat when in port.

When this vessel left Hernosand, July 12th, she was furnished with all the provisions required by Swedish law, amongst which were 13 barrels of salted meats. She reached New York December 15, 1879, and, as the master states in his testimony, they then had left about a barrel and a half of beef, with a like quantity of pork, having in five months consumed ten barrels of salted meat, or at the rate of two barrels a month. In his answer the master states that when he sailed from New York for Alexandria three barrels of beef and three of pork were on board. The voyage from New York to Alexandria occupied 75 days. They remained in that port 54 days. The master there procured 350 pounds of fresh meat, all of which was, without question, consumed before leaving that port. From thence to Alexandria the time was 45 days. It is not disputed that soon after leaving New York the master ordered the steward to allow the crew but three-quarters of a pound of salt beef, instead of the legal allowance of one and a half pounds per day for three days in the week. The men were thus cut short of one-half of the quantity to which they were entitled. They admit that this was enough for their dinners, but that nothing was left for breakfast; and that when they discovered that they had thus been restricted there was "considerable grumbling," but the quantity of beef was never increased.

Allowing but three-fourths of a pound of beef or pork per day to each man on the voyage from New York to Alexandria, and back to Gibraltar, there could not have been more than 300 pounds of salted meat remaining when the vessel sailed

from that port. The captain was informed by the steward that they had but this quantity, and that more provisions would be requisite. He swore he would not purchase any, but would trust to meeting at sea some ships from which their necessities would be supplied if the occasion arose. The master testified he was not aware of the scanty supply. It certainly was the duty of the master of such a vessel, before sailing on an Atlantic voyage, to ascertain the amount of his provisions on board, and he is to be held chargeable with like consequences as if he had actual knowledge thereof, even if the court were satisfied with his denial. The statement of the steward is corroborated by that of the second mate and others of the crew, and the court entertains no doubt that the master well knew the quantity with which he sailed. Shortly after leaving Gibraltar their allowance was reduced to half a pound of salted meat per day, and was gradually diminished, until for the last three weeks they had but three-quarters of pound of beef and the same amount of pork per week.

To supply their necessities the crew sometimes caught fish—the bonitas. When fresh they were proper food, but at times none could be taken, and the steward would then make soup of these fish, which had been hung up to dry or put in the old beef pickle. These fish soon spoiled, were utterly unfit for food, and were only used by the crew because of their necessitous condition.

The latter part of the voyage there was a deficiency of water, but the master took on board at Gibraltar more than was required by the Swedish law for the contemplated voyage. The sugar and molasses also fell short, but 115 pounds of sugar were purchased at Alexandria, and 25 pounds of molasses at Gibraltar, which were more than were requisite for the crew's allowance, protracted as was the voyage, if these articles had not been wasted or otherwise wrongfully disposed of. After leaving Alexandria there was neither butter nor oil. At that port the master purchased a small quantity of oil, which the men would not use on account of its alleged poor quality. The master, therefore, sailed from that port without obtaining either of these articles. In this

respect he was in fault, as he should have complied with the laws of his country, and obtained either oil or butter, that the crew might have the same if they should afterwards require it.

At Alexandria 1,100 pounds of ship bread were procured, 600 or 700 pounds of which, as the master states, were on hand when they left Gibraltar. The latter part of the voyage the crew were allowed one to two biscuits per day; less than half the quantity to which they were entitled by the Swedish law. By the laws of this country, 60 pounds of bread for each man is required to be stowed under the deck before sailing on an ocean voyage, and the amount on board the Amalia was in excess of the requirements of our law. Her voyage was much protracted, and 700 pounds of bread would ordinarily afford a crew of nine men an allowance of eight pounds per week on a voyage from Gibraltar to Portland. Such a voyage, at this season of the year, usually takes from 45 to 50 days; but with so foul a ship I think the master of the Amalia had no right to expect a passage of less than 60 days, or about two months. On her voyage to New York the crew consumed two barrels of beef or pork per month, and this master undertook to make his passage from Gibraltar to Portland with not more than one and a half barrels on board, having no reason to suppose that his passage would be less than 60 days, in which time, if the crew were supplied as on the voyage to New York, 800 pounds of salted meat would have been consumed by them; or, if the requirements of the Swedish law were observed, about 500 pounds would have been requisite.

It thus appears that there was a great and inexcusable deficiency in the supply of salt provisions when this vessel left Gibraltar. This was something more than an accidental mistake or error of judgment on the master's part in thus setting sail on this voyage with a short supply, endangering the safety of his ship and his crew, intending to speak to some vessel and obtain provisions from her if in need.

It is urged that the true test for the court to adopt, in deciding upon the question of the discharge of the crew from their

obligations to this ship, is whether there is reason to apprehend that they may again be subjected to a like condition of things if they remain in her service. But, in the opinion of the court, such is not the sole or principal question upon which the rights of these men must depend. There can be but little doubt that hereafter the master will provide all that is requisite for such a voyage, and that his crews will escape the sufferings these men have been subjected to; but the matter here for consideration is not the future conduct of the master, but what are the legal rights of the libellants, and whether on the present voyage they have been so treated by the master as to require the court to discharge them from further service.

When this vessel sailed from Gibraltar with so inadequate a supply of provisions the master knew that he was acting both in violation of the laws of his country and in breach of his contract with the libellants. From some cause he was willing thus to act, and in so doing was seriously endangering the safety of the ship and cargo, as well as the lives of all on board. At that season of the year, in the condition in which his ship then was, the chances were all against their reaching their port of destination before their salt provisions were exhausted, and to this risk he voluntarily subjected all on board, trusting that some passing vessel might supply their needs. The result of his conduct has been that, to prolong their lives, the crew, on some days, have been compelled to subsist on decayed fish, while on other days they have been wholly deprived of every kind of meat, or it has been doled out to them in so small a quantity as to be almost an aggravation of their miseries. Some of the crew have been, and still are, afflicted with one of the worst diseases that seamen can be subjected to—scurvy; their physician testifying that they are not now, and will not be for some time, in a condition to do duty on an ocean voyage, and all must have been necessarily much reduced in strength by their sufferings occasioned by the master's neglect. This, therefore, is no ordinary breach of a contract with his crew, by the master of a ship, but is of a most flagrant character, without the slightest justification, occasioning the crew very

great suffering, and endangering their lives. If, under any circumstances, a court of admiralty would be justified in exonerating a crew from further service under their contract, it is difficult to imagine a case where more cogent reasons could be found for such action of the court than are here presented.

It is claimed that the master treated his crew with cruelty and harshness, and that he assaulted one or more of them. It is sufficient to remark that the court does not find that the evidence sustains this charge. Another allegation is that the first mate abused the men, and that were they to remain on board in all probability they would again be subject to like treatment from that officer. The evidence discloses that on one occasion the mate did strike with a belaying pin one of the seamen on his head, inflicting a serious wound on the man's scalp, and that at another time another of the crew was struck by him with a bucket upon the shoulders. On both of these occasions the seamen were in fault, and merited moderate chastisement, but the court cannot justify the use of such instruments as the mate employed for this purpose. On both occasions the master was on board, and he does not appear to have taken any measures to restrain the mate's violence, although he was aware of the quarrels.

From all the testimony, I conclude that the mate is passionate, inclined to quarrel with his men, and ready to inflict punishment upon them, without much regard for the dangerous nature of the instrument employed by him, and that the master did not discharge his duty to his crew by protecting them from such assaults. I fear the crew may well expect such treatment hereafter from the mate, in case of any misunderstanding between them, and that it is desirable that they should no longer be exposed to danger at his hands; but I have grave doubts whether, from all that appears in evidence as to the mate's misconduct, I should for that cause be justified in discharging the entire crew, even if I should release those who have suffered from his assaults. I prefer to rest my decision upon the misconduct of the master in sailing from Gibraltar with such great lack of the provisions

required by the laws of his country for the support of his men.   For this cause they are declared entitled to their discharge, and to be paid the balance of their wages due to them at the time they left the ship.

It is further claimed in the libel that they are entitled to recover damages for having been put upon short allowance. The master having broken his contract with the libellants, and they having been injured thereby, they should be indemnified.   In such cases seamen have always received some compensation, and an allowance of one month's extra pay is for this cause decreed to each of the libellants.