## THE AUGUST BELMONT.

(District Court, S. D. Georgia, E. D.  April 24, 1907.)

1. ADMIRALTY—PLEADING—OBJECTIONS TO JURISDICTION.

   An objection to the jurisdiction of a court of admiralty over a cause should be made by plea, or, where the want of jurisdiction is palpable, by demurrer.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 1, Admiralty, § 260.]

2. SAME—JURISDICTION—SUIT BY SEAMEN AGAINST FOREIGN VESSEL.

   A United States court of admiralty has jurisdiction of a suit by a seaman against a foreign vessel to recover wages, and the exercise of such jurisdiction is discretionary. Where the libelant is an American citizen, signed in an American port, although on board the vessel, and claims to have been wrongfully discharged, jurisdiction will be entertained.

   [Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, § 134.]

3. SEAMEN—WAGES—ADVANCES.

   Evidence considered, and *held* to show that the voyage for which a libelant signed as a seaman was to terminate in a foreign port, and that he was therefore rightfully discharged in such port, but that he was entitled to recover a sum deducted from his wages on account of an advance payment made by the master when libelant signed in an American port, in violation of Act June 26, 1884, c. 121, 23 Stat. 55 amended by Act Dec. 21, 1898, c. 28, § 24, 30 Stat. 763 [U. S. Comp. St. 1901, p. 3080].

In Admiralty.  Suit by seaman for wages.

William R. Hewlett, for libelant.

Robert L. Colding, for respondent.

SPEER, District Judge. John Salter, a seaman and American citizen, has presented a libel in rem against the steamship August Belmont and her equipment. He alleges that in September, 1905, he engaged as coal passer with the master of the vessel for a voyage from Pensacola, Fla., to Germany and return, for wages of $30 a month. When the vessel reached Bremen, Germany, he claims that without cause he was unlawfully discharged. The American consul in that city then appealed to the master on his behalf, and he was permitted to return to the vessel as a "workaway"—a term applied to destitute seamen who work their passage home without compensation. The August Belmont, after touching at Hamburg, sailed for Savannah, where the libelant left the vessel. He claims that he was paid by the British consul at Bremen only £3 English money for the 25 days of the voyage from Pensacola, and $10 was illegally withheld. For this and other alleged earnings for the return trip to Savannah, besides a month's additional pay, authorized as a penalty for improper discharge by section 4527, Rev. St. [U. S. Comp. St. 1901, p. 3077], he brings his libel. The master contends that Salter was legally discharged, because the voyage ended at Bremen by the terms of the agreement under which he shipped, and that the money claimed to have been unlawfully withheld from his wages properly belonged to the master for a debt which the latter had personally paid for Salter, with his full and free consent, before the vessel left Pensacola.

The respondent further states that:

"The contract entered into was made on board a British steamship, before the British consul, at a time when said vessel was not within the jurisdiction of the Southern District of Georgia, and the contract terminated in Bremen, Germany, and, having been so made, the District Court of the United States is without jurisdiction of the subject-matter."

The question of jurisdiction is thus generally raised by answer. Proper pleading, however, requires that such defenses should be made by plea, or, where the defect is palpable, by demurrer. Knight v. Attila, Fed. Cas. No. 7,881; Teasdale v. The Ramler, Fed. Cas. No. 13,-815. While this is true, the court has no doubt of its jurisdiction to determine the merits of the controversy. There are numerous precedents, but the rule is defined by Mr. Justice Bradley, in the Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152, as follows:

"Circumstances often exist, which render it inexpedient for the court to take jurisdiction of controversies between foreigners in cases not arising in the country of the forum, as, where they are governed by the laws of the country to which the parties belong, and there is no difficulty in a resort to its courts, or where they have agreed to resort to no other tribunals. The cases of foreign seamen suing for wages, or because of ill treatment, are often in this category, and the consent of their consul, or minister, is frequently required before the court will proceed to entertain jurisdiction, not on the ground that it has not jurisdiction, but that, from motives of convenience or international comity, it will use its discretion whether to exercise jurisdiction or not; and where the voyage is ended, or the seamen have been dismissed or treated with great cruelty, it will entertain jurisdiction even against the protest of the consul."

Here, it will be observed, the libelant is an American citizen, the parties and the vessel are within reach of the processes of the court,

the voyage is ended, and the libelant, as contended, wrongfully dismissed. In the case of the Amalia (D. C.) 3 Fed. 653, it was held:

"It cannot admit of question that the District Court, unless restricted by some treaty stipulation, has jurisdiction in a case for wages against a foreign vessel, and that the exercise of such jurisdiction is discretionary."

Indeed, even where all the parties, the vessel, and the subject-matter are foreign, the courts of the United States constantly exercise their authority to prevent and ameliorate cruelty and injustice. The common seaman has ever been the ward of admiralty tribunals the world around. The principle is stated by Judge Simonton, in Wilson v. The John Ritson (D. C.) 35 Fed. 664:

"We have a case of a controversy between master and seaman of a foreign vessel, under a foreign flag, growing out of a contract made in their own country. There can be no question that, in the absence of treaty regulations to the contrary, this court has jurisdiction of the question, and that the exercise of the jurisdiction is wholly within its own discretion."

And the same doctrine is reiterated in the more recent case of Fairgrieve v. Marine Insurance Company of London, 94 Fed. 687, 37 C. C. A. 190, where said Judge Caldwell for the Eighth Circuit Court of Appeals:

"It is the settled law of this country that our admiralty courts have jurisdiction over suits between foreigners, if the subject-matter of the controversy is of a maritime nature, and the ship or party to be charged is within the jurisdiction of the court."

Other authorities to the same effect are: 2 Pars. Mar. Law, 543; The Karoo (D. C.) 49 Fed. 651; Bolden v. Jensen (D. C.) 70 Fed. 505. It is therefore obvious that, although the libelant may have signed shipping articles aboard a British ship, the conditions of his agreement were, nevertheless, subject to the regulations established by Congress, and to the remediable cognizance of our admiralty courts.

William Barnes, the master, testifies that the shipping articles of the vessel were filed with the British Board of Trade, and parol evidence has been submitted to show their tenor. The master testifies that Salter signed the articles on board the ship at Pensacola, in the presence of the British consul (now dead) and two witnesses, and that, previous to his signature, the consul read the articles, and said to each seaman: "This voyage is to terminate on the Continent, or the United Kingdom, at the master's option." The vessel, it appears, left Pensacola on September 30th, and, having reached Bremen on October 22d, Salter and others of the crew were discharged and paid on the 24th by the British consul at that port. The master denies that the libelant claimed any right to be brought back to America, and that his first intimation of this was a letter from the American consul on behalf of Salter and two other men. "Out of pity," he says, "I agreed to bring him back. The other men told me they would not work for nothing, and I said, 'There is the shore.' This man said the same thing, but, when I told him that, he said, 'Oh, captain, I want to go over,' and he stayed." The captain testifies that the libelant did his work as fireman on the voyage to Bremen in an incompetent, indifferent way, and on his return acted only as "a workaway on deck, and had no employment in the fireroom."

John Clark, first mate of the vessel, corroborates the master's testi-

mony that Salter was given distinctly to understand before he signed the shipping articles that the voyage was to terminate in the United Kingdom or on the Continent, and that all of the crew's contracts terminated at Bremen, and he as well as others now on the vessel were. employed under fresh agreements.

Matthew McKenzie, the engineer, testifies, substantially to the same effect, that Salter left the ship when he was paid off, and made no appearance until the vessel left Bremen for Hamburg.

The evidence shows that the libelant was an ignorant, country negro, whom the engineer testifies was shipped at Pensacola because a yellow fever epidemic made good seamen very scarce. On his own behalf, he testifies that he signed as a coal passer, and told the master: " 'I will sign provided you bring me back to the port you got me from,' and he said 'If you are a good boy, and work up all right, I will do that.' " He admits, however, that he signed the shipping articles in the presence of the consul, the engineer, and other witnesses.

George James, for the libelant, testifies that the latter understood from the captain that he would be returned to an American port, that the captain said, if he was coming back, he would bring him, and, if not, he would try to get him on some other ship. This, however, is only hearsay evidence of what Salter told the witness, and has little probative value.

The shipping articles are not before the court, but the proof indicates that the voyage was to terminate on the other side of the water, and that Salter understood this. Indeed, the only evidence to the contrary is a vague statement, said to have been made by the master, that, if libelant's work was satisfactory, he would see that he got back to America. Nothing whatever was said as to wages, nor was there any contract even to re-engage the libelant on the vessel. The contract of $30 a month wages, by all the testimony, terminated when the vessel reached Bremen. The libelant, by the permission of the master, slept and was fed on board the vessel for several days after reaching Savannah, until he found employment. His treatment was proper and kindly throughout the voyage. He does not appear to have made any demand for additional wages until the filing of this libel, and his claim therefor will be denied.

There is, however, one item which he may recover. This is the $10 withheld by the master when the crew were paid at Bremen. The master testifies that he personally paid a debt for Salter at his request before the ship left Pensacola, to save the trouble of sending the money from Europe, and he claims he had the right to withhold this amount from the libelant's wages. Such action on the master's part in paying the money and reimbursing himself was clearly in violation of the Revised Statutes of the United States. These provide, in section 10a of Act June 26, 1884, c. 121, 23 Stat. 55, as amended by Act Dec. 21, 1898, c. 28, § 24, 30 Stat. 763 [U. S. Comp. St. 1901, p. 3080] :

"That it shall be, and is hereby, made unlawful in any case to pay any seaman wages in advance of the time when he has actually earned the same, or to pay such advance wages to any other person. * * * The payment of such advance wages shall in no case, excepting as herein provided, absolve the vessel or the master or owner thereof from full payment of wages after

the same shall have been actually earned, and shall be no defence to a libel, suit, or action, for the recovery of such wages. * * *"

And in section 4548, Rev. St. [U. S. Comp. St. 1901, p. 3088]:

"Moneys paid under the laws of the United States, by direction of consular officers or agents, at any foreign port or place, as wages, extra or otherwise, due American seamen, shall be paid in gold or its equivalent, without any deduction whatever, any contract to the contrary notwithstanding."

The only exceptions to the absolute prohibition against advance payments are in cases of allotments to relatives, and, within strict limits, to creditors for board or clothing. Such a debt must have been contracted prior to the engagement, and, to be valid, the allotment note must be signed and approved by a shipping commissioner and inserted in the shipping articles. Salter testifies that the money was paid to supply him with a bed on board the vessel. If this is true, the violation of the statute is more flagrant. At all events, there has been no compliance with its provisions, and the vessel is civilly liable for the amount, if the master himself has not committed a misdemeanor.

The recovery of the libelant, therefore, will be limited to the amount of this advance payment, and judgment may be entered for him accordingly, with costs.