Robert Louis **BOUDREAU** and Sarah–Jane Boudreau, Plaintiffs,

v.

**S/V SHERE KHAN C, In Rem, and Wild Orchid, Limited, Defendants.**

No. Civ. 97–174–P–H.

United States District Court, D. Maine.

Oct. 30, 1998.

F. Jay Meyer, Thompson, McNaboe, Ashley & Bull, Portland, Maine, for plaintiffs.

Thomas E. Clinton, Thomas J. Muzyka, Clinton & Muzyka, Boston, MA, Laurence Minott, Sawyer, Sawyer & Minott, Windham, Maine, for defendants.

# FINDINGS OF FACT AND CONCLUSIONS OF LAW

HORNBY, Chief Judge.

This lawsuit arises out of a fire at sea, near the Canary Islands, during which the master of the S/V SHERE KHAN was injured.

The case is in this court because, at the plaintiffs' request, the United States Marshal seized the vessel in Camden, Maine, on May 17, 1997, during repairs. On June 13, 1997, the plaintiffs consented to the vessel's release, after Wild Orchard, Limited's counsel sent plaintiffs a letter of undertaking up to a value of $1,750,000. On July 2, 1997, Wild Orchid filed its claim and answer as owner of the SHERE KHAN.

I heard the case without a jury from September 21 to September 23, 1998. I now enter my findings of fact and conclusions of law. *See* Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

1. Robert Louis Boudreau and Sarah–Jane Boudreau are residents of Nova Scotia, Canada. Captain Boudreau is a citizen of Canada and Mrs. Boudreau is a citizen of the United Kingdom. At no time were the plaintiffs citizens or domiciliaries of the United States.

2. In May 1996, the plaintiffs entered into an agreement with Kendrick and Carolyn deKoning of Arizona that if the deKonings bought a yacht, Captain Boudreau would serve as its master and Mrs. Boudreau would serve as its stewardess. Captain Boudreau assisted the deKonings in their search for a vessel. When the SHERE KHAN was identified as a likely candidate for purchase, Captain Boudreau recommended that Mr. deKoning have a marine survey performed prior to purchase. Mr. deKoning hired Nicholas Moschonas, a Greek naval architect, to perform the pre-purchase survey. In July 1996, after a satisfactory survey, the deKonings formed Wild

Orchid, Limited, a Channel Islands corporation, which bought the SHERE KHAN, and the Boudreaus were hired to serve aboard her.

3. There was no written contract. The terms of the Boudreaus' employment were identical except as to salary. Captain Boudreau's salary was $4,800 per month, and Mrs. Boudreau's salary was $1,500 per month. Both received benefits worth $11,000 annually; these included uniforms, lodging aboard ship, food and health insurance. Both were entitled to one month's paid vacation per year, one month's notice pay upon termination, and two "lieu days" [1] per week. There was no agreement concerning length of employment.

4. Soon after the vessel's purchase, the deKonings took a five-week cruise of the Italian Riviera aboard the SHERE KHAN. Thereafter, the vessel entered an Italian shipyard for an extensive refit, in preparation for a transatlantic crossing. The deKonings ordered that the SHERE KHAN be sailed to Antigua in time for a December charter boat show. The intention was to show the vessel to prospective charter clients so that she might generate revenue in the Western hemisphere to offset her operating expenses.

5. Captain Boudreau was intimately involved in the refit of the SHERE KHAN in Italy. Captain Boudreau performed an inspection of the vessel and determined her seaworthy before her departure for Antigua in early November 1996.

6. In fact, the SHERE KHAN was unseaworthy for two reasons. First, the hatch cover on the lazarette was weathertight rather than watertight; under heavy weather, this posed a significant risk of water leaking into electrical equipment in the lazarette and causing a short circuit and fire. Second, there was no above-deck method of bypassing the lazarette hatch cover's hydraulic system; if that system ever failed, it would be extremely difficult to enter the lazarette, be-

---

1. Lieu days are akin to overtime compensation. Regular salary compensates crewmembers for a standard work week. Many times, however, crew are required to be aboard ship twenty-four hours a day, seven days a week; lieu days compensate the crew for this extra time served. If a crewmember works a seven day week, he or she receives either two extra days off at some later time, or receives two days' pay in addition to his or her regular salary.

cause the inoperable hydraulic ram would make a formidable lockout device.

7. Although Captain Boudreau had been engaged as master and was therefore responsible for operational seaworthiness of the vessel, he was not negligent in failing to be aware of these unseaworthy conditions and failing to correct them. First, they were both design defects not created by anything he did. Second, as captain he had no reason to know that the weathertight lazarette cover posed an unreasonable risk; neither the previous crew's summary of its experiences with the vessel nor the survey suggested any problems with the hatch cover. Captain Boudreau did know or should have known of a safety issue concerning the lack of a bypass for the lazarette's hydraulic system. Specifically, he was aware of an instance during the refit in which shipyard workers were trapped briefly inside the lazarette when the hydraulic ram was inoperable. That should certainly have put Captain Boudreau on notice of a safety issue in sending any crewmember into the lazarette without a guaranteed exit. Without an awareness that there was a particular risk of fire or other emergency in the lazarette that might require immediate access, however, there was no reason for him to conclude that dependence on the hydraulic system to get *into* the lazarette made the vessel unseaworthy. Below-deck spaces are often inaccessible without great effort and possible damage to the vessel. Decisions about the degree of access that should be available are design decisions that Captain Boudreau was not responsible for making.

8. On November 11 and 12, 1996, during her transatlantic voyage, the SHERE KHAN encountered heavy weather in international waters off the coast of the Canary Islands. During this heavy weather, seawater entered the SHERE KHAN's lazarette, even though the lazarette hatch cover was closed. The seawater caused a short circuit and a small fire with heavy smoke in the lazarette. The electrical malfunction rendered the hydraulic mechanism for the lazarette hatch cover inoperable. To fight the fire, Captain Boudreau and another crewmember had to open the lazarette hatch cover manually and with the use of crude levers (a wrench and a winch handle), an arduous task against the resistance of the hydraulic system. These unseaworthy conditions in combination caused Captain Boudreau to be injured. The strain of opening the hatch manually and falls to the wet deck in the process caused Captain Boudreau to injure his back.

9. It was unreasonably dangerous for Captain Boudreau to work on the wet deck in his bare feet during the gale even under emergency conditions. The defendants did not prove, however, that Captain Boudreau's negligence was a contributing cause to his personal injuries. The defendants have not persuaded me that Captain Boudreau would not have fallen if he had worn deck shoes, especially given Captain Boudreau's testimony that the boat was "corkscrewing" throughout his exertions.

10. It was not negligence for Captain Boudreau to use brute force to open the hatch. Specifically, under the emergency conditions of a gale on the high seas, with a fire in the lazarette where combustibles were stored, and given the absence of a fireproof bulkhead between the lazarette and the master stateroom, Captain Boudreau had to act quickly. He had legitimate concerns about the fitness of the rigging to provide a mechanical advantage to raise the hatch cover. Although there was a risk of a flash fire upon opening the hatch cover quickly, the risk proved nonexistent because of the great difficulty in raising the cover more than a crack, and, as it developed, the flames were minor. In short, Captain Boudreau acted responsibly in not choosing to leave the fire alone in the hope that it would smother itself, and in not using the rigging, which could have resulted in further damage to the seaworthiness of the vessel and would certainly have taken time to arrange. I observe that the defendants' expert's opinion to the contrary was based on the incorrect assumption that the bulkhead between the lazarette and the master stateroom was fireproof and that the rigging had a certain amount of strength, an amount that was ultimately not proven.

11. Wild Orchid discharged the Boudreaus and the rest of the crew of the SHERE KHAN on December 4, 1996, upon their arrival in Antigua. Captain Boudreau is

entitled to eight accrued vacation days, plus thirty-two lieu days, at a rate of $160 per day. Mrs. Boudreau is entitled to eight accrued vacation days, plus thirty-two lieu days at a rate of $50 per day, plus $877 in unreimbursed travel expenses for a trip to England to recruit a chef for the SHERE KHAN. Wild Orchid has requested deductions for payments made to the Boudreaus upon their discharge. The one month's salary paid to each plaintiff has been credited as satisfying the notice-pay obligation. The four additional days' salary paid on discharge will be credited against the amount owing each plaintiff. No evidence was offered to establish the value of the plane tickets to England that Wild Orchid provided the Boudreaus upon their discharge; any credit to Wild Orchid would be based on speculation. Accordingly, I am awarding Captain Boudreau and Mrs. Boudreau each thirty-six days pay and awarding Mrs. Boudreau her unreimbursed travel expenses. Therefore, the amount of compensation still unpaid is as follows: $5,760 for Captain Boudreau, and $2,677 for Mrs. Boudreau.

12. Discharge of the master and crew was not related to Captain Boudreau's medical condition, nor did Captain Boudreau ever request relief from his duties based on his medical condition. At the time of discharge, Captain Boudreau notified Wild Orchid's agent, Mr. Fisher, of his need for medical treatment. Captain Boudreau achieved maximum cure as of December 31, 1996. By that time, I conclude, Captain Boudreau's back injury had improved as much as it would. He is not entitled to medical or living expenses thereafter so far as maintenance and cure are concerned. As of that date, he had incurred no maintenance expenses because he was living at his mother-in-law's house free of charge. The Boudreaus have claimed $1,617.26 for medical expenses and treatment-related travel and lodging for the period in question. I have disallowed $554.36 of these expenses, representing the share of expenses incurred on behalf of Mrs. Boudreau and Matt Bennett. Captain Boudreau's allowable expenses for cure, therefore, total $1,062.90.

13. Wild Orchid has made no payments for Captain Boudreau's maintenance and cure. The plaintiffs have proven only one demand for maintenance and cure, made by the plaintiffs' counsel upon Wild Orchid's counsel by letter. In that letter, the plaintiffs' counsel claimed $3,193.69 in expenses. Of the expenses claimed, only $268.08 were actually allowable. The letter documented more than ten times as many unrecoverable expenses as recoverable expenses, and the amount demanded was triple what I have actually allowed. The letter itself can be construed as an invitation to make an offer as easily as it can be construed as a demand. Under these circumstances, I find that Wild Orchid's counsel's failure to respond to the plaintiffs' counsel's demand was not a willful, wanton or callous refusal by Wild Orchid to pay maintenance and cure.

14. Captain Boudreau's personal property was damaged by smoke to a loss of $840. Mrs. Boudreau's personal property was damaged to a loss of $410.

15. Captain Boudreau has not worked as a master since December 4, 1996. He can no longer captain a vessel, but he is capable of medium to light work on shore. Although he was previously a world traveler as a seaman with professed ties to his parents' retirement home in Florida, he has chosen now to settle in a small town in Nova Scotia and has limited his work there to self-employment composed of writing, teaching and constructing ship models. He has not sought other employment. There is no evidence that his earnings from these sources are any reliable indicator of his actual earning capacity. He has done no research regarding the market for his talents and has sought no vocational counseling. Furthermore, he admits that he does not work full-time, although there is no medical evidence that he is incapable of full-time work. I conclude, therefore, that to find a reduced earning capacity in any specific amount would be speculative.

16. Because of the injury, Captain Boudreau has needed and will probably need in the future physical therapy from time to time to maintain physical flexibility. To date that has cost him $119. It is possible that Canada's health care system will not always pro-

vide physical therapy without cost, but it would be speculative to assign any future dollar value to this element. Captain Boudreau has required $153.39 worth of pain medication to date. He will need a modest supply of pain medication for the rest of his life and I capitalize the amount at $1,500 (he is now paying slightly more than $6 per month). The remainder of Captain Boudreau's claimed medical expenses are litigation-related expenditures rather than consequential damages resulting from his injury.

17. Captain Boudreau has endured and will continue to endure substantial pain and suffering caused by the accident. Part of his pain and suffering, however, is caused by degenerative disk changes independent of the injury.

18. Captain Boudreau is entitled to recover for pain and suffering arising out of his injury, past, present and future, in the amount of $75,000.

## CONCLUSIONS OF LAW

### I. SUBJECT MATTER JURISDICTION

 The plaintiffs have invoked the admiralty jurisdiction of this court, *see* 28 U.S.C. § 1333, on all counts.[2] The court has subject matter jurisdiction over all of the plaintiffs' claims. Suits for unseaworthiness and for maintenance and cure are within admiralty jurisdiction, *see Zouras v. Menelaus Shipping Co.,* 336 F.2d 209, 211 (1st Cir.1964), as are seamen's suits for unpaid wages, *see The Amalia,* 3 F. 652, 653 (D.Me. 1880). The federal courts' admiralty jurisdiction extends to all suits of a maritime nature even between foreigners like these parties, although that jurisdiction is discretionary. *See, e.g., The Belgenland,* 114 U.S. 355, 365–66, 5 S.Ct. 860, 29 L.Ed. 152 (1885); *Zouras,* 336 F.2d at 211; *Monteiro v. Sociedad Maritima San Nicolas, S.A.,* 280 F.2d 568, 573 (2d Cir.1960) (Friendly, J.); *The Amalia,* 3 F. at 653.

### II. PERSONAL JURISDICTION OVER WILD ORCHID, LTD.

The plaintiffs allege jurisdiction over Wild Orchid based on Fed.R.Civ.P. 4(k)(2). Rule 4(k)(2) provides:

> If the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state.

Fed.R.Civ.P. 4(k)(2). The Rule sets out three requirements for the exercise of jurisdiction in this case: 1) the claim must arise under federal law; 2) Wild Orchid must not be subject to the long-arm jurisdiction of any state; and 3) Wild Orchid's aggregate contacts with the United States must satisfy the requirements of due process. *See Pharmachemie B.V. v. Pharmacia S.p.A.,* 934 F.Supp. 484, 486–87 (D.Mass.1996).

At the beginning of trial, I heard limited oral argument from the parties on the issue, but I reserved ruling because, in light of the letter of undertaking, Wild Orchid was defending the vessel *in rem* regardless. In their post-trial submissions, the parties have not argued the personal jurisdiction issue. I suspect they intend to abandon the issue, given the scope of the letter of undertaking. Because I preserved Wild Orchid's objections at trial, however, I will not treat them as abandoned without adequate notice. By the same token, there is not adequate briefing at this stage for me to make an informed ruling on this complicated issue, especially when I have reason to doubt that a concrete controversy still exists. Complex factual issues exist as to the second and third requirements of Rule 4(k)(2) which have not been adequately aired, and I will not resolve them without full briefing by the parties.

Accordingly, Wild Orchid will have seven (7) days from the date of this order to notify

---

2. After trial, the parties stipulated that Count 1, a Jones Act claim, be dismissed with prejudice and that the defendants' *forum non conveniens* defense be withdrawn with prejudice. What remains, therefore, are unseaworthiness (Count 2); maintenance and cure and punitive damages (Count 3); lost wages and punitive damages (Count 4); lost personal effects (Count 5). By stipulation, all of these claims are based upon the general maritime law of the United States.

the court that it wishes to brief the issue of personal jurisdiction and obtain a ruling. Failure to give such timely notice to the court will be an abandonment of any objection to personal jurisdiction over Wild Orchid.

### III. EVIDENTIARY ISSUES

After the close of the evidence but before submitting post-trial papers, the parties raised a dispute over whether the audio portion of a certain videotape (Exh.48) should be considered by the court. The plaintiffs objected to my considering the audio portion. At trial, however, when the plaintiffs moved the exhibit into evidence, I understood them to have agreed to the admission of the entire videotape—audio and video—for all purposes. The plaintiffs certainly never objected to the admission of the audio portion. Accordingly, it is in evidence.

During trial, I received numerous exhibits and some testimony *de bene esse*. Most of this evidence was offered by the plaintiffs to establish contacts between Wild Orchid and the United States, either for choice-of-law or personal jurisdiction purposes. Specifically, I am referring to Exhibits 27, 28, 31, 32, 37, 53, 54, and 130, as well as testimony of Captain Boudreau concerning discussions with Carolyn deKoning while on board the vessel HARBINGER, testimony of Captain Boudreau regarding Ms. deKoning's alleged statements that Kathi Leary of Midwest Trust Co. handled all the money for the SHERE KHAN, and the testimony of Wilson Darwin, of Wayfarer Marina in Camden, regarding contacts with the vessel after the accident but before the vessel's arrest. Given the current posture of the case, there is no need for me to rule on that evidence now.

I have not ruled on the following exhibits yet, and do so now.

■ *Exhibit 1* is a pay scale for charter crews, prepared in January 1994 by Caribbean Connections, a vessel charter broker retained to find charter clients for the SHERE KHAN. Apparently the document was kept on board as part of the SHERE KHAN's files. Presumably, the plaintiffs are offering this document to show Captain Boudreau's earning capacity as a charter vessel captain.

The document is of limited probative value given the year it was prepared, and Captain Boudreau's own testimony was far more probative on this issue. The document is admitted into evidence as a business record, but I have given it no weight. I have relied on Captain Boudreau's own testimony to determine that he was earning and had the capacity to earn $4,800 monthly salary, plus $11,000 annual benefits as a charter captain.

■ *Exhibit 2* contains mortality tables published by the U.S. Department of Health and Human Services. Wild Orchid objected to the admission of these tables on relevancy grounds, arguing that since Captain Boudreau lives in Canada, U.S. census data are irrelevant to his life expectancy. I admitted the tables *de bene esse* but exclude them now on the ground that any conclusion I would draw from them regarding Captain Boudreau's life expectancy would be completely speculative.

■ *Exhibits 74 and 80* are written statements of crewmembers of the SHERE KHAN that discuss the fire and Captain Boudreau's injuries. The plaintiffs argued that these statements are not hearsay because the declarants are agents or authorized persons of a party opponent. *See* Fed. R.Evid. 801(d)(2). I rule that these statements do not come within Rule 801(d)(2), and I exclude them as simple hearsay. These statements were prepared after the declarants had been discharged from their employment, and they had no authority to speak on behalf of Wild Orchid on the subject of the accident at the time they made these statements. Moreover, the statements in their current form—letters "To Whom It May Concern," prepared at Captain Boudreau's request—simply are outside the scope of any employment with the vessel and are not statements that Wild Orchid ever authorized.

*Exhibits 88, 90, 91, 98* are electrical diagrams and schematics and repair invoices, all prepared by Cay Electronics, an outfit in the British Virgin Islands that worked on the SHERE KHAN in 1997. Robert Wassell, an employee of Cay, testified to these exhibits during his depositions, parts of which were used in place of live trial testimony. I re-

served ruling on the exhibits until I had seen the deposition testimony. I have not relied upon them and no ruling is necessary.

*Exhibit 93* is a letter from the plaintiffs' Boston counsel to Wild Orchid's counsel, detailing cure expenses and requesting "contact ... with respect to maintenance and cure as soon as possible." I rule the letter admissible to show demand.

*Exhibit 146* is a table purporting to establish a standard work life expectancy. The document appears to be photocopied from the appendix of a legal journal. The defendants objected on hearsay grounds, and I notified the plaintiffs that I would allow both sides to rest and would subsequently accept from the plaintiffs some standard actuarial table on work life expectancy. The plaintiffs submitted no such evidence, and the record is now closed.

■ *Testimony of Carl Beal.* During the plaintiffs' direct examination, Mr. Beal testified as to the cause of the fire in the lazarette. I received the testimony *de bene esse* pending cross-examination on the foundation of his opinion. Cross-examination did not reveal an adequate basis to exclude Mr. Beal's opinion. The defendants' main attacks on the basis of Mr. Beal's opinion were Mr. Beal's lack of mathematical certainty about certain contributing factors in the leak and fire in the lazarette. Mr. Beal testified credibly that such mathematical certainty was not necessary for him to render a competent opinion and explained credibly how he was able to determine the cause of the fire from his two firsthand inspections of the vessel and the crew reports of the circumstances of the fire.

## IV. Unpaid Wages

■ Count IV of the plaintiffs' complaint claimed breach of contract by Wild Orchid for not paying "certain wages and compensation ... in connection with their employment as seamen on board the S/V SHERE KHAN C." Pls.' Compl. at ¶ 21. The plaintiffs prayed for the unpaid compensation, punitive damages and attorney fees. *See id.* at ¶ 22. In its trial brief, Wild Orchid suggested that the plaintiffs could not recover under the Seamen's Wage Act, 46 U.S.C. § 10313, because they were crewmembers of a foreign vessel who were not discharged into an American port. *See* Defs.' Trial Br. at 12–14. I conclude that the defendants are correct so far as the Seamen's Wage Act is concerned. *See Su v. M/V Southern Aster,* 978 F.2d 462, 470–71 (9th Cir.1992). But the plaintiffs never claimed to rely exclusively on the Wage Act; they have consistently taken the position that "there is no legitimate basis for arguing that the plaintiffs have no claims under United States law for their unpaid wages." Pls.' Amended Pretrial Mem. at 10. The defendants never expressly claimed that United States statutes were the only potential ground of relief under United States law, and while the plaintiffs may have rested their right to relief entirely on the applicability of United States law, they never rested their entitlement to relief exclusively on United States *statutory* law.

Eventually, the parties entered a stipulation that United States law governs their dispute on all claims, including the wage claim. They never indicated whether they were agreeing that the Wage Act applies or were only agreeing to apply whatever United States law—statutory or otherwise—may be relevant. There might be a question whether Captain Boudreau, as master of a foreign-flagged vessel, can proceed *in rem* against the vessel in an American court for his wages. *See* Grant Gilmore and Charles L. Black, Jr., *The Law of Admiralty* (2d ed.1975) ¶¶ 9–20 at 625 (discussing the general maritime law to the contrary but pointing out the statutory change for vessels "registered, enrolled or licensed" under American law). In their post-trial submissions, however, the defendants contest only the amount of unpaid wages, not their liability for unpaid wages.

On this state of the record, I treat the liability question as conceded.

## V. Earning Capacity

■ Under federal common law, a plaintiff is entitled to recover for past lost wages and for diminution of his or her earning capacity. Captain Boudreau did not suffer any lost wages as a result of his personal injuries; he was an at-will employee whose discharge was unrelated to his injuries. The plaintiffs'

claim, therefore, is for diminished earning capacity.

The evidence establishes Captain Boudreau's pre-injury earning capacity to a reasonable certainty—$68,600 per year. It is equally clear that Captain Boudreau can no longer engage in the specific activity—sea captaining—that earned him that sum in the past. There is no evidence, however, to prove that Captain Boudreau cannot earn the same amount of money in some other pursuit. There is certainly evidence that Captain Boudreau's actual earnings are now far below his actual earnings before the accident. But it is equally clear from the evidence that Captain Boudreau's current earnings do not represent his current earning capacity. Furthermore, there is medical evidence that Captain Boudreau's remaining *work* capacity is for light-to-medium work. But I lack any evidence that would permit me to attach a value to that residual work capacity; no one has given me any basis to translate Captain Boudreau's residual *work* capacity into a residual *earning* capacity. Having developed everything in the record except for the relevant fact in issue—whether Captain Boudreau can still earn $68,600 per year—each party rests its case on the claim that the other bears the burden of proof. On the particular facts of this case, in this Circuit, the defendants are correct.

■■■ The plaintiff bears the burden of proving losses to a reasonable certainty. *See Fashauer v. New Jersey Transit R. Operations. Inc.*, 57 F.3d 1269, 1284 (3d Cir.1995). The plaintiff has a duty to take reasonable steps to minimize his or her losses, and the defendant bears the burden of proving breach of such a duty as an affirmative defense. *See id.* at 1289. Briefly stated, the issue here is whether proof of the value of the plaintiff's residual earning capacity is an element of plaintiff's *prima facie* proof of diminished earning capacity, or whether such proof is an element of defendant's proof of failure to mitigate.

The federal courts are not of one mind on this issue. *Compare Fashauer*, 57 F.3d at 1289 (holding that the defendant bears the burden of proving failure to mitigate for the period prior to trial and the plaintiff bears

the burden of proving post-trial loss of earning capacity) *and Quinones–Pacheco v. American Airlines, Inc.*, 979 F.2d 1, 7 (1st Cir.1992) (holding that the plaintiff bears the burden of proving "the extent and likely duration of [the] plaintiff's claimed disability, what other work he can perform betimes, and what he can earn in such pursuits" and without such proof, a trial court properly can exclude evidence of losses stemming from the inability to do a particular job) *with Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 361–63 (3d Cir.1998) (holding that a captain makes out a *prima facie* case, under the liberal Third Circuit rule on loss of earning capacity, by showing inability to work as a sea captain, despite continuing work as a seaman) *and DeBiasio v. Illinois Cent. R.R.*, 52 F.3d 678, 687 (7th Cir.1995) (holding that proof of inability to return to a specific job and of value of that job satisfies plaintiff's *prima facie* burden on damages). The law of the First Circuit, however, favors Wild Orchid.

■■■ Under First Circuit law, the plaintiffs failed to make out a *prima facie* case of actual loss; the question whether defendants carried a burden to prove failure to mitigate, therefore, is immaterial. Under First Circuit law,

loss of earning capacity is an economic concept based upon a medical foundation. A plaintiff has the burden of proving his claimed loss of earning capacity. To do so, he must offer evidence from which a jury may reasonably determine the annualized stream of income that the plaintiff, uninjured, would probably have earned, and contrast it, over the period of proven disability, to a similar forecast of what the injured plaintiff's earnings are likely to be.

*Quinones–Pacheco*, 979 F.2d at 6–7. The First Circuit has approved this rule as a matter of federal common law. *See Stevens v. Bangor & Aroostook R.R. Co.*, 97 F.3d 594, 599 (1st Cir.1996) ("In FELA cases plaintiff must prove pre-injury and post-injury earning potential.") (citing *Quinones–Pacheco* ).

While the plaintiffs proved the income that Captain Boudreau would probably have earned uninjured, I cannot make a similar forecast of what his future earnings are rea-

sonably likely to be. Captain Boudreau's current actual earnings provide no basis for me to estimate his likely future earnings because there is ample evidence that Captain Boudreau has made no efforts to earn to his full capacity. Accordingly, his actual earnings simply are not evidence of his residual earning capacity—his reasonably likely future earnings—in this case. Without any other evidence of his residual earning capacity, the plaintiffs have failed to make out a *prima facie* case of diminished earning capacity. Certainly, without proof of the value of the light-to-medium work that Captain Boudreau can do, the mere fact that Captain Boudreau no longer can work as a sea captain is insufficient to impose liability on Wild Orchid. *See Quinones–Pacheco,* 979 F.2d at 7. Because no actual loss was proven here, the issue of mitigation is never reached.

## VI. Unseaworthiness

 "A claim based on unseaworthiness enforces the shipowner's 'absolute duty to provide to every member of his crew "a vessel and appurtenances reasonably fit for their intended use." ' " *Ferrara v. A. & V. Fishing, Inc.,* 99 F.3d 449, 453 (1st Cir.1996) (quoting *Hubbard v. Faros Fisheries, Inc.,* 626 F.2d 196, 199 (1st Cir.1980) (quoting *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960))). The shipowner's duty is nondelegable, *see McAleer v. Smith,* 57 F.3d 109, 114 (1st Cir.1995), and "liability ... is not dependent upon theories of negligence." *Ferrara,* 99 F.3d at 452; *see also Mitchell,* 362 U.S. at 550, 80 S.Ct. 926 ("What has evolved is a complete divorcement of unseaworthiness liability from concepts of negligence."). The reason for this rule "is that unseaworthiness is a *condition,* and how that condition came into being—whether by negligence or otherwise—is quite irrelevant to the owner's liability for personal injuries resulting from it." *Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971). As I have found, the S/V SHERE KHAN was unseaworthy on account of two design aspects of the lazarette hatch cover. The defendants do not seriously contest this.

 Although a shipowner's liability does not depend on any fault of the shipown-

er, the admiralty doctrine of comparative negligence applies to an unseaworthiness count and can mitigate a sailor's recovery. *See Wilson v. Maritime Overseas Corp.,* 150 F.3d 1, 11 (1st Cir.1998). Moreover, under the primary duty rule, "a ship's officer may not recover against his employer for negligence or unseaworthiness when there is no other cause of the officer's injuries other than the officer's breach of his consciously assumed duty to maintain safe conditions aboard the vessel." *Id.* The defendants press both these defenses.

### A. Primary Duty Rule and Comparative Negligence

 I have found as a matter of fact that Captain Boudreau breached no duty in failing to correct the two unseaworthy design aspects of the lazarette hatch cover. As a result, the primary duty rule does not apply. *See id.* ("The primary duty rule bars recovery only if there was no cause of the officer's injuries other than the breach of duty."). Even if Captain Boudreau had consciously assumed a duty to correct the SHERE KHAN's design flaws, I make the following observations. The law in this District is that the primary duty rule is not a defense where the unseaworthy condition, like those here, exists before the voyage in question. To apply it in such cases "would eliminate one of the foundations of the seaworthiness doctrine—that the owner's duty to supply a seaworthy ship is nondelegable." *Snow v. Boat Dianne Lynn, Inc.,* 664 F.Supp. 30, 34 (D.Me.1987).

Because Captain Boudreau was not negligent in failing to correct the unseaworthy design aspects of the lazarette hatch, his recovery will not be reduced for such failure. Nor is there any need for me to apportion causation among each of the two design faults.

### B. Damages

The plaintiffs advanced their personal property claims in a separate count but have articulated no theory of recovery apart from unseaworthiness. I treat that Count (Count V), therefore, as simply an additional element of damages under unseaworthiness.

## VII. Maintenance and Cure

Where a seaman suffers injury or falls ill while in the service of a ship, the owner and the ship are liable, regardless of fault, for the seaman's maintenance and cure. (I reject the defendants' unsupported assertion that the primary duty defense also applies to maintenance and cure.) "The term 'maintenance and cure' refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery from an injury or malady." *LeBlanc v. B.G.T. Corp.*, 992 F.2d 394, 397 (1st Cir.1993). The remedy is essentially curative in nature and is not intended as compensation for injury. *See id.* Moreover, the remedy is strictly personal; it is not family support for the injured sailor's dependents. *See Macedo v. F/V Paul & Michelle*, 868 F.2d 519, 522 (1st Cir.1989).

Once it attaches, the right to maintenance and cure continues until the sailor is "so far cured as possible." *Farrell v. United States*, 336 U.S. 511, 518, 69 S.Ct. 707, 93 L.Ed. 850 (1949). A sailor unable to make a full recovery does not receive a lifetime's maintenance and cure; rather, the right to, maintenance and cure ceases once the sailor's treating physicians declare the condition permanent and incapable of being improved. *See Hubbard*, 626 F.2d at 201–02.

## VIII. Interest

Prejudgment interest is generally available in non-Jones Act admiralty cases. *See Borges v. Our Lady of the Sea Corp.*, 935 F.2d 436, 443 n. 1 (1st Cir.1991). The purpose of prejudgment interest is to compensate the plaintiff for the time-value of the plaintiff's money that the defendant held from the date of plaintiff's loss to the date of judgment. *See id.* at 444. Interest is proper on both liquidated and unliquidated claims, so long as they are for past losses; interest is not proper on future losses, and "the date of the start of trial is the usual cut-off date." *Id.* at 445. Factors to consider in determining an interest award include: responsibility for delays in litigation, certainty of the defendant's liability and the amount of damages, and judicial efficiency. *See Portland Pipe*

*Line Corp. v. M/V Barcola*, 1982 A.M.C. 2725, 2738–39 (D.Me.). The goal is to compensate plaintiff properly for the time-value of the money defendant owed, without requiring extensive factfinding by the court. *See id.* at 2739.

Looking at the total damages picture, prejudgment interest is not appropriate in this case. The lion's share of the plaintiffs' damages here are for pain and suffering, and much of that award is for future pain and suffering, on which interest cannot be awarded. I decline to award prejudgment interest on Captain Boudreau's other personal-injury damages. Wild Orchid was legitimately uncertain about the existence of Captain Boudreau's injuries, legitimately believed that Captain Boudreau was responsible for any injuries he actually suffered, and had legitimate questions about the injuries' extent. Moreover, Wild Orchid did nothing to delay the resolution of this case.

As far as the wage claims are concerned, Wild Orchid made a lump-sum payment to the plaintiffs upon their discharge. Any further liability of Wild Orchid depended in large part on conflicting recollections of whether one month's notice pay was a term of the Boudreaus' oral employment contracts. Again, Wild Orchid's liability for these damages was highly uncertain. Moreover, the Boudreaus have not made it clear when they first notified Wild Orchid that any wages were in dispute. On these facts, it is not appropriate to devote judicial resources to setting an accrual date for prejudgment interest.

## IX. Judgment

Accordingly, the Clerk shall enter judgment for the plaintiffs in the amount of Eighty–Seven Thousand Five Hundred Twenty–Two Dollars and Twenty–Nine Cents ($87,522.29), representing $1,250 for personal property loss; $1,062.90 for maintenance and cure; $1,772.39 for medical expenses not included under maintenance and cure; $75,000 for pain and suffering; and $8,437 in unpaid wages and compensation.

Attorney fees for maintenance and cure are **DENIED.** Prejudgment interest is **DENIED.**

**SO ORDERED.**